UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RICHARD CASTELLINI,

    Plaintiff,

v.

HARLEY G. LAPPIN (in his official capacity as Director of the Bureau of Prisons),

    Defendant.

**VERIFIED COMPLAINT**

Case No. ____

05 10220 PBS

FILED IN CLERK'S OFFICE
2005 FEB -3 P 3: 51
U.S. DISTRICT COURT
DISTRICT OF MASS.

RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE 2/3/05

Plaintiff Richard Castellini ("Mr. Castellini"), for his Verified Complaint, hereby alleges as follows:

## INTRODUCTION

Plaintiff brings this action to enjoin the Bureau of Prisons ("BOP") from effectuating its decision to terminate the Shock Incarceration Program, which it publicly announced on January 14, 2005. The BOP's abrupt and unilateral decision violates both the United States Constitution and the Administrative Procedure Act. The BOP is merely an administrative agency, and does not have the legal authority to terminate this program, which was created by Congress and must remain in operation unless and until Congress decrees otherwise. In addition, the BOP's decision violates the notice-and-comment requirement of the Administrative Procedure Act, 5 U.S.C. § 553, and the Ex Post Facto clause of the U.S. Constitution.

## JURISDICTION AND VENUE

1.    This case arises under the United States Constitution and the laws of the United States, and presents a federal question within this Court's jurisdiction under Article III of the

United States Constitution and 28 U.S.C. § 1331. This Court has jurisdiction to review agency action pursuant to the Administrative Procedure Act, 5 U.S.C. § 702.

2. Venue is proper in this District under 28 U.S.C. § 1391(e)(2), as a substantial part of the events or omissions giving rise to this claim occurred here.

## PARTIES

3. Plaintiff Richard Castellini is an individual residing in New Jersey, with his wife and three children. Mr. Castellini operates a business called Island Marine Center, which sells and services boats.

4. Defendant Harley G. Lappin is the Director of the BOP.

## BACKGROUND

### The Shock Incarceration Program

5. The Shock Incarceration Program, administered as the Intensive Confinement Center ("ICC") program by the BOP, was established by an act of Congress in 1990.[1] Under 18 U.S.C. § 4046, Congress authorized the BOP to reduce the sentences of inmates who successfully participated in an initial, six-month period of "strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training."

---

1   The text of 18 U.S.C. § 4046 provides as follows:

> (a) The Bureau of Prisons may place in a Shock Incarceration Program any person who is sentenced to a term of imprisonment of more than 12, but not more than 30, months, if such person consents to that placement.
> (b) For such initial portion of the term of imprisonment as the Bureau of Prisons may determine, not to exceed 6 months, an inmate in the Shock Incarceration Program shall be required to—
>     (1) adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training; and
>     (2) participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.
> (c) An inmate who in the judgment of the Director of the Bureau of Prisons has successfully completed the required period of shock incarceration shall remain in the custody of the Bureau for such period (not to exceed the remainder of the prison term otherwise required by law to be served by that inmate), and under such conditions, as the Bureau deems appropriate.

6. This statute was the subject of an extensive congressional hearing during which the House of Representatives heard testimony from a number of witnesses, including the BOP and state officials operating Shock Incarceration Programs. According to the House Report accompanying the bill, the proposed legislation was based on the following findings: (1) the overcrowded state of federal prisons; (2) the success of Shock Incarceration Programs in reducing costs; (3) the fact that recidivism rates for participants in these programs were no greater than that of ordinary inmates; (4) the self-esteem, discipline and other virtues instilled by these programs; and (5) the inmate follow-up provisions that would be a component of the federal program.

7. The House Report also spoke directly to the need for legislative action in creating a Shock Incarceration Program—as opposed to letting the BOP create the program through administrative channels:

> [T]he Bureau of Prisons does not have the legal authority necessary to operate a Shock Incarceration Program. While the BOP could set up a boot camp prison, it has no authority to release an inmate before that inmate's term would otherwise expire. A Shock Incarceration Program is based upon an inmate serving a shorter, but more arduous, term. Legislation is necessary, therefore, if there is to be a Federal Shock Incarceration Program.

See House Report No. 101-681, reported at 1990 U.S.C.C.A.N. 6472, 6557-60.

8. The House Report also contemplates the possible use by the BOP of analogous state programs. Congress addressed the possibility that the Shock Incarceration Program would fail. In particular, Congress addressed an objection raised by the BOP that the program would fail because too few prisoners would be eligible. The majority of legislators passing the bill responded as follows: "[i]f this proves to be the case, the Director can, consistent with this legislation and under authority given the Director by 18 U.S.C. 4042, contract with States that

3

operate shock incarceration programs to place eligible Federal prisoners in State boot camp prisons." Id., at 6621 n.6.

9. The BOP has discharged its responsibility to administer the Shock Incarceration Program by the use of ICCs, which combine the features of a military boot camp and a traditional prison. The BOP began placing inmates in ICC facilities in the early 1990s. According to a BOP Program Statement, the purpose of the ICC Program is "to place inmates in a highly structured environment as a means of promoting personal development, self-control, and discipline, thereby reducing the potential for recidivism." See BOP Program Statement 5390.08, § 7(a) ("P.S. 5390.08"). The BOP currently operates three ICCs: in Lewisburg, Pennsylvania, Lompoc, California and Bryan, Texas.

10. The ICC Program has strict eligibility requirements. It is only available to prisoners sentenced to a term of more than 12 but fewer than 30 months. It is only available to first-time offenders who did not commit a crime of violence. See 28 C.F.R. § 524.31(a)(1)-(3). The inmate must be cleared for housing in a minimum security facility, be physically and mentally capable of participating in the program, and must volunteer for the program. See 28 C.F.R. § 524.31(a)(4)-(6). An inmate may be designated to the ICC Program via a recommendation from the sentencing judge or by the BOP's own determination. See P.S. 5390.08, § 9(a). While the sentencing judge's recommendation is taken into consideration, the final decision on placement rests with the BOP Regional Designators. Id., § 9(b).

11. The "boot camp" phase of the ICC Program lasts six months. See 28 C.F.R. § 524.32(b). Inmates are placed in single-gender facilities where they undergo a strict daily regimen. The 17-hour day includes physical conditioning, military drill and ceremony and labor-

4

intensive work assignments. See P.S. 5390.08, § 7(b). In addition, the program offers education, drug and alcohol counseling and other life-management skills. Id.

12. There are a number of benefits available to an inmate who is placed in, and successfully completes, the Shock Incarceration Program. First, after serving six months in an ICC, the inmate may be transferred to a Community Corrections Center ("CCC"), often in the inmate's home community, for a period of two to six months. See 28 C.F.R. § 524.32(d)(1); P.S. 5390.08, § 15-16. If the inmate successfully completes this CCC portion of the sentence, he or she may serve the remainder of the sentence in home confinement. See P.S. 5390.08, § 16(a). Importantly, upon successful completion of the Shock Incarceration Program and the CCC portion of a sentence, the inmate is eligible for up to a six-month reduction in his or her sentence. Id., § 524.32(d)(2).

13. The BOP has, until recently, described the Shock Incarceration Program in glowing terms. For instance, in an internal analysis of ICC graduates, the BOP touted the substantial cost savings of shock incarceration inmates vis a vis non-ICC inmates. See BOP Office of Research and Evaluation, "Evaluation of Post-Release Success for the First 4 Classes Graduating from the Lewisburg Intensive Confinement Center," November 15, 1996, at 1-2. This document also notes the various "benefits" of returning low-risk offenders to their families. Id. at 2. Furthermore, the internal analysis notes that the recidivism rate for shock incarceration graduates is "substantially lower" than graduates of similar state boot camp program, id. at 6, and described "the ICC's demonstrated success regarding low rearrest rates . . ." Id. at 7.

14. Earlier, the BOP Director sent a memorandum to all chief federal judges imploring them to encourage district judges to recommend the Shock Incarceration Program for appropriate female defendants. See Memorandum from Kathleen M. Hawk to Chief Federal

5

Judges, April 11, 1994. In the memo, Ms. Hawk described the "successful development of this project" and claimed that she was "very proud of what our staff in the ICC at Bryan have accomplished." Id., at 1. Ms. Hawk was "personally convinced . . . that the ICC program has much to offer to female offenders." Id., at 2.

15.  Indeed, less than six months prior to the unilateral termination of the program, the ICC Administrator sent an information packet to chief federal judges describing the Shock Incarceration Program and encouraging them to disseminate the information to "anyone who has questions about the program." See Letter from Dave Moffat to Hon. Joseph A. Giacobbe, July 28, 2004.

### The Sentencing Judge Recommends the ICC Program for Mr. Castellini

16.  Mr. Castellini was indicted by a grand jury in the District of Massachusetts on March 29, 2001, charged with money laundering and money laundering conspiracy based on his ensnarement in an Internal Revenue Service sting operation focusing on tax evasion via the use of off-shore trusts. After a two-week trial in July 2002, he was convicted of two violations of the money laundering sting provision, 18 U.S.C. § 1956(a)(3) and one count of conspiracy to launder money, 18 U.S.C. § 1956(h).

17.  A sentencing hearing was scheduled for August 12, 2003. Prior to the hearing, Mr. Castellini's probation officer, U.S.P.O. Emily Piovoso, encouraged Mr. Castellini to consider serving his sentence in the ICC Program. Mr. Castellini was enthusiastic about the option.

18.  At the sentencing hearing, Mr. Castellini received a sentence of 21 months imprisonment. Because of his age, the nonviolent nature of his offense, the length of his sentence, and his lack of any criminal history, Mr. Castellini met all of the then-existing

eligibility criteria for admission to the BOP's Shock Incarceration Program. See 28 C.F.R. § 524.31. Indeed, had Mr. Castellini successfully completed the Shock Incarceration Program and the subsequent CCC term, his sentence would have been reduced by five months. See P.S. 5390.08, § 16(a).

19.     Mr. Castellini's sentence was stayed pending his appeal to the First Circuit. The First Circuit affirmed his sentence and conviction on December 15, 2004.

20.     On approximately December 20, 2004, Mr. Castellini's counsel spoke with Michelle Ruane, an administrator for the ICC program at USP-Lewisburg. She advised that the next session of the Shock Incarceration Program would commence on February 15, and that openings were available for that session.

21.     Mr. Castellini thus moved the district court to amend the judgment to include a recommendation that he be permitted to self-report to the ICC at Lewisburg on February 14, 2005. The Motion was allowed on January 6, 2005.

### The BOP Unilaterally Terminates the Shock Incarceration Program

22.     On January 5, 2005, defendant Lappin sent an e-mail message to the entire BOP staff. Lappin stated that, due to budgetary pressures, he was instituting a number of "cost savings initiatives" for the next fiscal year. One of these initiatives was the cancellation of the Shock Incarceration Program. Lappin stated as follows: "Three Intensive Confinement Center (ICC) programs, currently operated at USPs Lewisburg and Lompoc and FPC Bryan, will be phased out and replaced with ordinary minimum security programs." As justification for this abrupt termination, Lappin stated that "[t]he ICC programs are exceedingly costly to maintain and a substantial body of research indicates that they have no impact on reducing recidivism." Lappin stated that the ICCs would close for good on July 15, 2005, after the last remaining

inmates finished their term in the program. No further inmates would be accepted into the Shock Incarceration Program.

23. The BOP did not submit the decision to terminate the Shock Incarceration Program to the notice-and-comment procedures contained in the Administrative Procedure Act. See 5 U.S.C. § 553. On at least 40 prior occasions when the BOP has made changes to the Shock Incarceration Program, it followed these notice-and-comment provisions—even when the changes were largely ministerial. See, e.g., 68 Fed. Reg. 73157 (2003) (amending regulations as to its drug abuse treatment program); 64 Fed. Reg. 9428 (1999) (amending regulations relating to inmates' participation in program reviews); 61 Fed. Reg. 18658 (1996) (final rule adopting regulations relating to the operation of the ICC program).

24. On January 7, 2005, after Mr. Castellini had received the recommendation from the sentencing judge, Mr. Castellini's counsel called Ms. Ruane at ICC Lewisburg to inquire about the program. She informed him that the program has been abruptly terminated.

25. On January 14, 2005, Lappin publicized the termination of the Shock Incarceration Program through a memorandum to federal judges, chief U.S. probation officers, federal public defenders and U.S. Attorneys in which he stated that no more inmates would be received in ICCs, effective immediately. See Memorandum from Harley G. Lappin, January 14, 2005 ("January 14, 2005 memo").

26. According to the January 14, 2005 memo, the Shock Incarceration Program was being terminated due to the failure to reduce recidivism rates and the expenses associated with the facilities' operation. See January 14, 2005 memo, at 1-2. As support for these contentions, the memorandum links to two studies of state Shock Incarceration Programs.

27.     It is clear that the BOP's decision to terminate the program was made abruptly and unilaterally. On January 26, 2005, the Director of the Administrative Office of the United States Courts informed federal judges, federal public defenders, chief probation officers and chief pretrial services officers that the BOP was terminating the Shock Incarceration Program. The memorandum states as follows:

> Unfortunately, this decision was made by the BOP without advance notice and without soliciting the views of the Judicial Conference, its Criminal Law Committee, the Administrative Office's Office of Probation and Pretrial Services, or chief probation and pretrial services officers. The Executive Committee of the Judicial Conference will take up this matter with the new Attorney General at a meeting planned for March, but we have assurance of the outcome because of the strong position of the BOP.

See Memorandum from Leonaidas Ralph Mecham, Director of Administrative Office of the United States Courts, January 26, 2005.

28.     On January 21, 2005, Mr. Castellini's counsel spoke with the BOP Community Corrections Manager in Boston, who confirmed that the Shock Incarceration Program was shutting down. On the same day, Mr. Castellini's counsel spoke with an employee in the designations department at BOP's regional office in Philadelphia, who confirmed that the Shock Incarceration Program had been terminated, and that no more designations to the program were to be made.

29.     Mr. Castellini has no administrative remedy at his disposal. He may not utilize the BOP's Administrative Remedy Program because Mr. Castellini has not yet reported to the BOP to serve his sentence. As such, he is not (1) an "inmate" (2) being held in a BOP "institution" (3) who can present his issue to a member of the BOP "staff," as is required by applicable regulations. See 28 C.F.R. 500.1(b)-(d); 28 C.F.R. 542.13. For similar reasons, Mr.

Castellini is not subject to the exhaustion procedures of the Prison Litigation Reform Act; Mr. Castellini is neither a "prisoner" nor is he incarcerated in an "institution" as those terms are defined by the statute. See 42 U.S.C § 1997; § 1997e; § 1997e(h).

30. Any attempt to exhaust administrative remedies, moreover, would be futile. First, according to the January 14, 2005 memo, the termination of the program, which was announced by the highest authority at the BOP, is certain. Second, the termination of the Shock Incarceration Program was announced only 32 days prior to Mr. Castellini's report date.

31. Mr. Castellini is currently due to self-report to prison on February 14, 2005. Absent injunctive relief, and the opportunity to participate in the ICC Program, Mr. Castellini will suffer irreparable harm not only to his family life but also to his business interests.

## COUNT I
### (Ultra Vires Agency Action)

32. Mr. Castellini repeats and realleges the facts stated in Paragraphs 1-31 as if set forth separately herein.

33. A federal agency may only take actions consistent with its delegated authority that do not conflict with express Congressional intent.

34. The Shock Incarceration Program was created by Congress. The text and legislative history of 18 U.S.C. § 4046 demonstrates that Congress not only created the Shock Incarceration Program but intended its continued operation.

35. Congress only delegated to the BOP the authority to implement the Shock Incarceration Program under the parameters set by Congress. The BOP does not have the power to terminate the Shock Incarceration Program. By terminating the Shock Incarceration Program, the BOP is unlawfully attempting to make basic and fundamental changes to a program created by Congress.

36. By taking actions in excess of its delegated authority, the BOP's actions were ultra vires. Moreover, the BOP's actions cannot be defended on any "permissible construction" of its statutory authority.

37. The BOP's actions have directly harmed Mr. Castellini. If the unlawful termination is undisturbed, Mr. Castellini will not have the opportunity to be considered for admission to an ICC. Successful completion of the Shock Incarceration Program would have resulted, inter alia, in a five-month reduction in Mr. Castellini's sentence. See P.S. 5390.08, § 16(a).

## COUNT II
### (Violation of APA Notice-and-Comment Requirements)

38. Mr. Castellini repeats and realleges the facts stated in Paragraphs 1-37 as if set forth separately herein.

39. Any actions taken by a federal agency that constitute legislative or substantive rulemaking are subject to the notice-and-comment procedures of the Administrative Procedure Act. See 5 U.S.C. § 553. These procedures, include, inter alia, providing notice that it intends to change the law, providing a statement of authority, and allowing a comment period. See 5 U.S.C. § 553(b). Under § 553(c), an agency must publish this notice at least 30 days before the effective date of the action.

40. On at least 40 prior occasions when the BOP has made changes to the Shock Incarceration Program, it has submitted those changes to the provisions of § 553—even when those changes were largely ministerial. See, e.g., 68 Fed. Reg. 73157 (2003) (amending regulations as to its drug abuse treatment program); 64 Fed. Reg. 9428 (1999) (amending regulations relating to inmates' participation in program reviews); 61 Fed. Reg. 18658 (1996) (final rule adopting regulations relating to the operation of the Shock Incarceration Program).

41.    The BOP's decision to terminate the Shock Incarceration Program was a legislative or substantive rulemaking decision, rather than a mere interpretive rule or statement of policy.

42.    The BOP terminated the Shock Incarceration Program without following any of the notice-and-comment provisions contained in § 553.

43.    By failing to submit its decision for notice and comment, the BOP deprived numerous interested parties—such as the Administrative Office of the United States Courts—of airing their views relating to this abrupt decision.

### COUNT III
### (Violation of Ex Post Facto Clause of the U.S. Constitution)

44.    Mr. Castellini repeats and realleges the facts stated in Paragraphs 1-43 as if set forth separately herein.

45.    Article I of the United States Constitution prohibits the enactment of an ex post facto law. A penal law is an ex post facto law if (1) it is retrospective and (2) it disadvantages the offender affected by the law.

46.    The BOP's termination of the Shock Incarceration Program was an unconstitutional ex post facto law. The action was retrospective because it applies, inter alia, to persons, such as Mr. Castellini, who had already been sentenced with a recommendation for participation in an Shock Incarceration Program. Thus, the BOP's action changes the legal consequences of acts completed before its effective date.

47.    The BOP's actions also disadvantage Mr. Castellini. If the BOP's unlawful action stands, Mr. Castellini will not able to serve his prison term in an ICC. Among other things, had Mr. Castellini successfully completed the Shock Incarceration Program and the subsequent CCC term, his sentence would have been reduced by five months.

## **PRAYER FOR RELIEF**

Mr. Castellini requests that this Court:

(1)  Issue a temporary restraining order and preliminary and permanent injunctions:

  a.) enjoining the BOP from effectuating its decision to terminate the Shock Incarceration Program;

  b.) ordering the BOP to continue operation of its ICC Program consistent with its operation of the program before any decision was made to terminate the program; and,

  c.) ordering the BOP to in good faith consider Mr. Castellini for placement in an ICC program pursuant to criteria that existed prior to the BOP's decision to terminate the program; or, as an alternative to the above,

  d.) ordering the BOP to administer Mr. Castellini's sentence in a manner that affords him the advantages of the ICC program, including his being eligible for designation to a Community Confinement Center after six months and for a reduction in his sentence.

(2)  Order such other relief as is just and proper.

Respectfully submitted,

RICHARD CASTELLINI

By his attorney,

_____
James C. Rehnquist (BBO # 552602)
David S. Schumacher (BBO # 647917)
Sheryl A. Koval (BBO # 657735)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

OF COUNSEL:

Stephen Galoob
GOODWIN PROCTER LLP
901 New York Avenue N.W.
Washington, D.C. 20001
(202) 346-4000

Dated: February 3, 2005

## VERIFICATION

I, Richard Castellini, and declare under pains and penalty of perjury that I have reviewed the foregoing Verified Complaint and that the factual allegations contained therein are true to the best of my knowledge and belief.

_____
Richard Castellini

Dated: February 3, 2005

LIBA/1448914.3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB -3  P 3:51

U.S. DISTRICT COURT
DISTRICT OF MASS.

1. Title of case (name of first party on each side only)___Richard Castellini v. Harley G. Lappin___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(2)).

    ___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,       Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    ___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    ___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    ___  V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court
   _____None_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC § 2403)

   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? – (See Local Rule 40.1(d)).

   Not applicable         YES ☐    NO ☐

   A. If yes, in which division do all of the non-governmental parties reside?

      Eastern Division ☐       Central Division ☐       Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

      Eastern Division ☐       Central Division ☐       Western Division ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME_____James C. Rehnquist_____

ADDRESS_____Goodwin Procter, LLP, Exchange Place, Boston, MA 02109_____

TELEPHONE NO._____617-570-1000_____

(Cover sheet local.wpd - 10/17/02)
LIBA/1300586.1

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
RICHARD CASTELLINI

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

James C. Rehnquist (BBO #552602)
David S. Schumacher (BBO #647917)
Sheryl A. Koval (BBO #657735)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Goodwin Procter LLP   Tel: 617-570-1000
Exchange Place, Boston, MA 02109

## DEFENDANTS
HARLEY G. LAPPEN (in his official capacity as Director of the Bureau of Prisons)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 5 U.S.C. §702
Brief description of cause: See attached sheet.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
None.  (See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE: February , 2005
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____