UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD CASTELLINI ) | |
| ) | **MEMORANDUM OF LAW IN** |
| Plaintiff, ) | **SUPPORT OF RICHARD** |
| ) | **CASTELLINI'S MOTION FOR** |
| v. ) | **TEMPORARY RESTRAINING ORDER** |
| ) | **AND/OR PRELIMINARY** |
| HARLEY G. LAPPIN (in his official capacity ) | **INJUNCTION** |
| as Director of the Bureau of Prisons), ) | |
| ) | Case. No. ___ |
| Defendant. ) | |

Pursuant to Fed. R. Civ. P. 65, Plaintiff Richard Castellini ("Mr. Castellini"), submits this memorandum in support of his Motion for Temporary Restraining Order and/or Preliminary Injunction to prevent Director Harley G. Lappin from terminating the Shock Incarceration Program within the Bureau of Prisons ("BOP").

## INTRODUCTION

On January 14, 2005, the Bureau of Prisons, per Director Harley Lappin, abruptly and unilaterally announced that it was terminating the Shock Incarceration Program established by Congress under 18 U.S.C. § 4046. Under this program, which the BOP had consistently administered since the 1990 enactment of § 4046, certain federal prisoners can earn a reduction in their sentences by serving the first six months of the sentence in a "boot camp" prison setting. Plaintiff Richard Castellini, who met all of the eligibility criteria for participation in the Shock Incarceration Program, was recommended by this Court (Tauro, J.) for the program, and is scheduled to self-report on February 14, 2005.

The BOP's termination of the Shock Incarceration Program is unlawful for several reasons, and Mr. Castellini is likely to succeed on the merits of his claims. First, inasmuch as Congress has expressed an unambiguous intention that the program exist, the BOP's decision to

the contrary exceeds its statutory authority. See Bowen v. University Hospital, 488 U.S. 204, 208 (1988) (agency's powers limited to those delegated by Congress). Second, the BOP's decision is invalid because it failed to comply with the notice-and-comment requirements of 5 U.S.C. § 553. Indeed the Administrative Office of the U.S. Courts has already publicly registered its dismay, in a memorandum this Court may have already received, that the BOP's decision was made without advance notice and without any input from judges and probation officers, among others. Finally, the BOP's decision violates the Constitution's ex post facto clause.

As explained below, all of the other criteria for injunctive relief are met here: Mr. Castellini's harm absent an injunction is irreparable; the blance of harms tilits in his favor; and an injunction is in the public interest. See Matus v. Clinton School District, 367 F.3d 69 (1st Cir. 2004). This Court should order the BOP to cease its termination of the Shock Incarceration Program, and to make a good faith decision, under the criteria that existed prior to its termination decision, whether to accept Mr. Castellini into the program. Alternatively, the Court should order the BOP to administer Mr. Castellini's sentence so that he receives all the advantages he would have had under the program.

## BACKGROUND

### The Shock Incarceration Program

The Shock Incarceration Program was established by an act of Congress in 1990. Under 18 U.S.C. § 4046, Congress authorized the BOP to reduce the sentences of inmates who successfully participated in an initial, six-month period of "strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training." This statute was the subject of an extensive congressional hearing during which the House of Representatives heard testimony from a number of witnesses, including the BOP and state officials operating Shock

Incarceration Programs. See House Report No. 101-681, reported at 1990 U.S.C.C.A.N. 6472, 6621. According to the House Report accompanying the bill, the proposed legislation was based on the following findings: (1) the overcrowded state of federal prisons; (2) the success of state-administered Shock Incarceration Programs in reducing costs; (3) that recidivism rates for participants in these programs were no greater than that of ordinary inmates; (4) the self-esteem, discipline and other virtues instilled by these programs; and (5) the inmate follow-up provisions that would be a component of the federal program. Id. at 6557-58.

The House Report also spoke directly to the need for legislative action in creating a Shock Incarceration Program—as opposed to letting the BOP create the program through administrative channels:

> [T]he Bureau of Prisons does not have the legal authority necessary to operate a Shock Incarceration Program. While the BOP could set up a boot camp prison, it has no authority to release an inmate before that inmate's term would otherwise expire. A Shock Incarceration Program is based upon an inmate serving a shorter, but more arduous, term. Legislation is necessary, therefore, if there is to be a Federal Shock Incarceration Program.

Id. at 6557.

The House Report also contemplates the possible use by the BOP of analogous state programs. In particular, Congress addressed an objection raised by the BOP that the program would fail because too few prisoners would be eligible. The majority of legislators passing the bill responded as follows: "[i]f this proves to be the case, the Director can, consistent with this legislation and under authority given the Director by 18 U.S.C. 4042, contract with States that operate shock incarceration programs to place eligible Federal prisoners in State boot camp prisons." Id. at 6621 n.6.; Compl. ¶ 8.

The BOP has historically discharged its responsibility to administer the Shock Incarceration Program by the use of what it calls Intensive Confinement Centers (ICCs), which combine the features of a military boot camp and a traditional prison. The BOP began placing inmates in ICC facilities in the early 1990s. According to a BOP Program Statement, the purpose of the ICC Program is "to place inmates in a highly structured environment as a means of promoting personal development, self-control, and discipline, thereby reducing the potential for recidivism." See BOP Program Statement 5390.08, § 7(a) ("P.S. 5390.08") (attached hereto as Exhibit A); 28 C.F.R. § 524.30-524.32; Compl. ¶ 8. The BOP currently operates three ICCs: in Lewisburg, Pennsylvania, Lompoc, California and Bryan, Texas. See P.S. 5390.08, § 18(d).

Under § 4046 and as administered by the BOP, the ICC Program has strict eligibility requirements. It is only available to prisoners sentenced to a term of more than 12 but fewer than 30 months. 18 U.S.C. § 4046. It is only available to first-time offenders who did not commit a crime of violence. See 28 C.F.R. § 524.31(a)(1)-(3); Compl. ¶ 10. The inmate must be cleared for housing in a minimum security facility, be physically and mentally capable of participating in the program, and must volunteer for the program. See 28 C.F.R. § 524.31(a)(4)-(6); Compl. ¶ 10. An inmate may be designated to the Shock Incarceration Program via a recommendation from the sentencing judge or by the BOP's own determination. See P.S. 5390.08, § 9(a); Compl. ¶ 10. While the sentencing judge's recommendation is taken into consideration, the final decision on placement rests with the BOP Regional Designators. See P.S. 5390.08, § 9(b); Compl. ¶ 10.

The "boot camp" phase of the ICC Program lasts six months. See 28 C.F.R. § 524.32(b); Compl. ¶ 11. Inmates are placed in single-gender facilities where they undergo a strict daily regimen. Id. The 17-hour day includes physical conditioning, military drill and ceremony and

4

labor-intensive work assignments. See P.S. 5390.08, § 7(b); Compl. ¶ 11. In addition, the program offers education, drug and alcohol counseling and other life-management skills. Id.

There are a number of benefits available to an inmate who is placed in, and successfully completes, the boot camp phase of the ICC Program. See Compl. ¶ 12. First, after serving six months in an ICC, the inmate may be transferred to a Community Corrections Center ("CCC"), often in the inmate's home community, for a period of two to six months. See 28 C.F.R. § 524.32(d)(1); P.S. 5390.08, § 15-16; Compl. ¶ 12. Second, if the inmate successfully completes this CCC portion of the sentence, he or she may serve the remainder of the sentence in home confinement. See P.S. 5390.08, § 16(a); Compl. ¶ 12. Finally, upon successful completion of the Shock Incarceration Program and the CCC portion of a sentence, the inmate is eligible for up to a six-month reduction in his or her sentence. See P.S. 5390.08, § 524.32(d)(2); Compl. ¶ 12.

The BOP has, until recently, described the ICC Program in glowing terms. For instance, in an internal analysis of ICC graduates, the BOP touted the program. See BOP Office of Research and Evaluation, "Evaluation of Post-Release Success for the First 4 Classes Graduating from the Lewisburg Intensive Confinement Center," November 15, 1996, at 1-2 ("BOP Evaluation") (attached hereto as Exhibit B). This study notes the various "benefits" of returning low-risk offenders to their families. Id. at 2. Furthermore, the internal analysis notes that the recidivism rate for shock incarceration graduates is "substantially lower" than graduates of similar state boot camp program, id. at 6, and described "the ICC's demonstrated success regarding low rearrest rates . . ." Id. at 7.

In 1994, the BOP Director sent a memorandum to all chief federal judges asking them to encourage district judges to recommend the Shock Incarceration Program for appropriate female defendants. See Memorandum from Kathleen M. Hawk to Chief Federal Judges, April 11, 1994

(attached hereto as Exhibit C). In the memo, Ms. Hawk described the "successful development of this project" and claimed that she was "very proud of what our staff in the ICC at Bryan have accomplished." Id. at 1. Ms. Hawk was "personally convinced . . . that the ICC program has much to offer to female offenders." Id. at 2.

Indeed, less than six months prior to the abrupt termination of the program, the ICC Administrator sent an information packet to chief federal judges describing the Shock Incarceration Program and encouraging them to disseminate the information to "anyone who has questions about the program." See Letter from Dave Moffat to Hon. Joseph A. Giacobbe, July 28, 2004 (attached hereto as Exhibit D).

### The Sentencing Judge Recommends Mr. Castellini for the ICC Program

Mr. Castellini was sentenced to 21 months imprisonment on August 12, 2003. See Judgment Against Richard Castellini, dated August 12, 2003 (attached hereto as Exhibit E). Because of his age, the nonviolent nature of his offense, the length of his sentence, and his lack of any criminal history, Mr. Castellini met the then-existing eligibility criteria for admission to the BOP's Shock Incarceration Program. See 28 C.F.R. § 524.31. Indeed, had Mr. Castellini successfully completed the Shock Incarceration Program and the subsequent CCC term, his sentence would have been reduced by five months. See P.S. 5390.08, § 16(a).

Mr. Castellini's sentence was stayed pending his appeal to the First Circuit. The First Circuit affirmed his sentence and conviction on December 15, 2004. United States v. Castellini, No. 03-2252 (D. Mass. Dec. 15, 2004). On approximately December 20, 2004, Mr. Castellini's counsel spoke with Michelle Ruane, an administrator for the ICC program at USP-Lewisburg. Compl. ¶ 20. She advised that the next session of the Shock Incarceration Program would commence on February 15, and that openings were available for that session. Id. Mr. Castellini

thus moved the district court to amend the judgment to include a recommendation that he be recommended for the ICC Program and that he be permitted to self-report on February 14, 2005, the next "entry date" for the ICC Program at USP-Lewisburg. See Defendant's Motion for Amendment of Judgment, dated December 21, 2004 (attached hereto as Exhibit F). The Motion was allowed on January 6, 2005. See Defendant's Motion for Amendment of Judgment Allowed (Tauro, J.), dated January 6, 2005 (attached hereto as Exhibit G). He currently is scheduled to self-report to the BOP on February 14, 2005, id., although no facility has been designated by the BOP.

### The BOP Unilaterally Terminates the Shock Incarceration Program

On January 7, 2005, after Mr. Castellini had received the recommendation from the sentencing judge, Mr. Castellini's counsel called Ms. Ruane at ICC Lewisburg to inquire about the program. She informed him that the program has been abruptly terminated. Compl. ¶ 24. On January 14, 2005, defendant Lappin publicized the termination of the Shock Incarceration Program through a memorandum to federal judges, chief U.S. probation officers, federal public defenders and U.S. Attorneys, in which he stated that no more inmates would be received in ICCs, effective immediately. See Memorandum from Harley G. Lappin, January 14, 2005 ("January 14, 2005 memo") (attached hereto as Exhibit H). According to the January 14, 2005 memo, the Shock Incarceration Program was being terminated due to the failure to reduce recidivism rates and the expenses associated with the facilities' operation. Id. at 1-2. As support for these contentions, the memorandum links to two studies of state Shock Incarceration Programs. Id.

## ARGUMENT

A preliminary injunction is appropriate where the moving party demonstrates (1) a likelihood of success on the merits; (2) the potential for irreparable harm absent the injunction; (3) the balance of hardships favors the moving party; and (4) the public interest is served by the injunction. See, e.g., Matrix Group, Ltd. , Inc. v. Rawlings Sporting Goods, Inc., 378 F.3d 29, 34 (1st Cir. 2004). Here, each factor cuts in favor of an injunction.[1]

### I. MR. CASTELLINI IS LIKELY TO SUCCEED ON THE MERITS.

#### A. The BOP Lacks Authority to Terminate the Shock Incarceration Program.

It is a fundamental principle of administrative law that an agency's powers are limited to the authority delegated by Congress. See, e.g., Bowen v. University Hospital, 488 U.S. 204, 208 (1988). Under the framework established in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), "if the intent of Congress is clear from the face of a statute," then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. Agency action that is contrary to congressional intent must be rejected, for "if a court... ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id., at 843 n. 9. As explained below, Congress intended that a Shock Incarceration Program exist within the federal prison system. The BOP's unilateral decision to terminate the program is inconsistent with this intent and is therefore ultra vires.

---

[1] Mr. Castellini has no administrative remedy at his disposal. Because he has not yet reported to the BOP to serve his sentence, and therefore is not (1) an "inmate" (2) being held in a BOP "institution" (3) who can present his issue to a member of the BOP "staff," the applicable BOP regulations do not apply. See 28 C.F.R. 500.1(b)-(d); 28 C.F.R. 542.13. For similar reasons, Mr. Castellini is not subject to the exhaustion procedures of the Prison Litigation Reform Act; Mr. Castellini is neither a "prisoner" nor is he incarcerated in an "institution" as those terms are defined by the statute. See 42 U.S.C § 1997; § 1997e; § 1997e(h). Any attempt to exhaust administrative remedies, moreover, would be futile, given the definitiveness of the BOP's decision and the imminence of Mr. Castelini's self-report date.

### 1. Congress Intended the Existence of a Shock Incarceration Program, and Only Authorized the BOP to Administer the Program.

The text and structure of 18 U.S.C. § 4046 demonstrate that Congress created and intended the continued operation of the Shock Incarceration Program. The statute, titled "Shock Incarceration Program," was part of the Crime Control Act of 1990. Pub. O. 101-647. Section 3001 of the Act, codified at 18 U.S.C. § 4046, provides:

> **(a)** The Bureau of Prisons may place in a Shock Incarceration Program any person who is sentenced to a term of imprisonment of more than 12, but not more than 30, months, if such person consents to that placement.
> **(b)** For such initial portion of the term of imprisonment as the Bureau of Prisons may determine, not to exceed 6 months, an inmate in the Shock Incarceration Program shall be required to—
>> **(1)** adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training; and
>> **(2)** participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.
> **(c)** An inmate who in the judgment of the Director of the Bureau of Prisons has successfully completed the required period of shock incarceration shall remain in the custody of the Bureau for such period (not to exceed the remainder of the prison term otherwise required by law to be served by that inmate), and under such conditions, as the Bureau deems appropriate.

Although Congress gave the BOP discretion in its administration of the program—e.g., the BOP "may place" certain persons in the program—Congress plainly intended that the program exist. Section 3002 of the Act authorized appropriations in "fiscal year 1990 and each year thereafter such sums as may be necessary to carry out <u>the Shock Incarceration Program established under the amendments made by this act</u>." Pub. L. 101-647, sec. 3002 (emphasis added). Congress even mandated certain of the program's parameters, see 18 U.S.C. § 4046 ("an inmate in the Shock Incarceration Program shall be required to . . ."), which would have been an exercise in futility if the program were not intended to exist. See <u>Halverson v. Slater</u>, 129 F.3d 180, 185

9

(D.C. Cir. 1997) (statutes must be read consistently with "the familiar doctrine that the Congress cannot be presumed to do a futile thing.").

The legislative history of § 4046 confirms this distinction between Congressional creation and BOP implementation. Congress based its policy judgment to create the Shock Incarceration Program on, inter alia, overcrowding in federal prisons and the proven track-record of state Shock Incarceration Programs at producing similar recidivism rates while teaching inmates "self-esteem, self-discipline, self-responsibility, and how to work." See House Report No. 101-681(I), reported at 1990 U.S.C.C.A.N. 6472, 6558. Congress observed that the BOP itself lacked the authority to create a Shock Incarceration Program (as opposed to a "boot camp prison"), and concluded "[l]egislation is necessary… if there is to be a Federal Shock Incarceration Program." Id. at 6558. Congress therefore enacted § 4046, authorizing the "Bureau of Prisons to operate a shock incarceration program," consistent with the framework set forth in the statute. Id.

The BOP's role in administering the Shock Incarceration Program—supervising the implementation of a program mandated by Congress—is consistent with its legislatively delegated authority. As a general matter, the BOP is charged with "the management and regulation of all Federal penal and correctional institutions." 18 U.S.C. § 4042(a)(1). In addition, Congress has directed the BOP to implement particular programs, vesting it with discretion in the program's implementation. For example, Congress has delegated to the BOP authority to reduce the sentence of a prisoner who successfully completes a drug treatment program. Under 18 U.S.C. § 3621(e)(2)(B), "the period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the

prisoner must otherwise serve." (emphasis added). Like § 4046, § 3621(e)(2)(B) establishes the BOP's discretionary responsibility to administer a program mandated by Congress, a program it could not operate absent a specific delegation of Congressional authority. The BOP cannot terminate the Shock Incarceration Program any more than it could cancel the drug treatment required under § 3621(e)(2)(B).[2]

### 2. BOP's Power to Administer the Shock Incarceration Program Does Not Include the Power to Eliminate It.

Given Congress's intent that a Shock Incarceration Program exist, the BOP's termination of the program exceeds its authority. An illustrative case demonstrating this point is MCI Telecoms. Corp. v. AT&T Corp., 512 U.S. 218 (1994). In MCI, the Supreme Court disallowed the Federal Communications Commission's ("FCC") interpretation of 47 U.S.C. § 203. One subsection of that statute "requires communications common carriers to file tariffs with the [FCC]," while another "authorizes the [FCC] to 'modify' any requirement of § 203." Id., at 220 (citing 47 U.S.C. §203(a)-(b)). The FCC contended that the power to "modify" § 203's requirements gave it the authority to make tariff filing optional for all "nondominant" long-distance carriers. Id. The Court rejected the FCC's argument, reasoning that the verb "modify" could not be interpreted so loosely as to authorize such "basic and fundamental changes in the scheme" Congress intended. Id. at 224. Because Congress had created the tariff scheme, the FCC's rendering the scheme voluntary was "effectively the introduction of a whole new regime

---

[2] In Lopez v. Davis, 531 U.S. 230, 239 (2001), the culmination of extensive litigation over which prisoners were eligible for § 3621(e)(2)(B)'s credit program, the Court acknowledged petitioner's argument that the BOP's discretion over the operation of the program did not confer the authority to frustrate Congress's purpose by erecting "additional hurdles" to achievement of the credit, as such an exercise of discretion would "mak[e] a nullity of the statute." Id. at 243, n. 4 (quoting INS v. Yueh-Shaio Yang, 519 U.S. 26, 31, (1996)). The Court rejected the argument because a substantial number of inmates had earned the credit. Id. Here, of course, there can be no dispute that the BOP's termination decision makes a nullity of § 4046.

of regulation.... which may well be a better regime but is not the one that Congress established." Id., at 234.

Under the reasoning of MCI, the BOP's action is plainly ultra vires. Here, as in MCI, the BOP's action works a "basic and fundamental change"—to say the least—in the scheme Congress intended. Indeed there could be no more "basic and fundamental change" to a program than its elimination. The BOP's delegated supervisory authority over the Shock Incarceration Program is, if anything, weaker than that of the FCC in MCI, as the BOP is authorized only to operate the Shock Incarceration Program and not to "modify" legislative requirements.

At bottom, the BOP has simply substituted its own current judgment about Shock Incarceration Programs for the policy decision Congress made in enacting § 4046.[3] It is impermissible, of course, for the BOP to discontinue a congressionally-created program because it disagrees with the effectiveness of the program. Under Chevron, an agency may not "avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy." Engine Mfrs. Assn. v. EPA, 88 F.3d 1075, 1089 (D.C. Cir. 1996); see also Succar v. Ashcroft, 2005 WL 18230, *22 (1st Cir. Jan. 5, 2005) ("Many of the Attorney General's arguments go to the reasonableness of the regulation . . . [but] the Attorney General's reasonable actions cannot control in the face of clear contrary congressional intent . . . The desire for administrative efficiency cannot displace clear congressional intent."). In short,

---

3  The BOP has justified the program's termination in part on the grounds that "[t]he ICC programs are exceedingly costly to maintain and a substantial body of research indicates that they have no impact on reducing recidivism." See Exhibit H attached hereto. Yet this position actually conflicts with the judgments Congress made in creating the Shock Incarceration Program. Lowering recidivism was not one of Congress's concerns in creating the program: the House Report expressly observed that "the recidivism rate for shock incarceration is either less than or no greater than the recidivism rate for ordinary incarceration." See 1990 U.S.C.C.A.N. at 6557 (emphasis added). Rather, Congress was primarily concerned with the Shock Incarceration Program's potential for "reducing costs and overcrowding." Id. at 6558. While the BOP's implementation of the Shock Incarceration Program may not have realized the cost savings expected by Congress, Congress's view was that it should, and it is only Congress that can terminate the program.

Congress has made the policy judgment that the Shock Incarceration Program should exist, and the BOP lacks authority to reverse that judgment.

### 3. The BOP Cannot Defend its Termination of the Shock Incarceration Program As An "Interpretation" of Its Statutory Authority.

As explained above, the BOP has no general authority over the Shock Incarceration Program: it has been authorized only with the responsibility to administer the program consistent with congressional parameters. The BOP may nonetheless attempt to defend its decision as a permissible interpretation of the statute, arguing it is entitled to so-called "Chevron deference." See Chevron, 467 U.S. at 843, ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"). Any such argument will fail. Nothing in § 4046 or in § 4042, which enumerates the BOP's powers, even remotely suggests that the BOP has such authority. Nor can such authority be inferred from any "gaps" in the statutory scheme. See, e.g., Succar, 2005 WL at *17 ("[W]here Congress has enacted a law that does not answer the precise question at issue" the agency empowered to administer the program may only "fill[] the statutory gap in a way that is reasonable in light of the legislature's revealed design.") (internal quotation marks omitted) (quoting Lopez v. Davis, 531 U.S. 230, 242 (2001)). Indeed Congress not only has created the Shock Incarceration Program, it has also spelled out certain details regarding its implementation.[4] Congress's provision of this detail demonstrates that it contemplates the existence of the Shock Incarceration Program, and any construction of the BOP's authority to allow it to frustrate this intent to the contrary would not be "permissible" under Chevron.

---

4   See 18 U.S.C. § 4046(b) (requiring participants in the Shock Incarceration Program to "adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training" and "participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.")

Among other defects, any such construction would violate the canon of statutory interpretation requiring courts to avoid a construction that renders a statute a "nullity." See, e.g., United States v. Ven-Fuel, 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

**B.     The BOP Violated the APA's Notice-and-Commit Requirement.**

Mr. Castellini is also likely to prevail because the BOP's action was legislative in nature and thus is subject to the notice-and-comment procedures of the APA. See 5 U.S.C. § 553. Any actions taken by a federal agency that constitute legislative or substantive rulemaking are subject to these notice-and-comment procedures. Lincoln v. Vigil, 508 U.S. 182, 195-196 (1993). The statute requires that "general notice of proposed rule making shall be published in the Federal Register..." and must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Any substantive rule which is not issued in accordance with this section is void. Auer v. Robbins, 519 U.S. 452, 459 (1997).

The BOP's decision to terminate the Shock Incarceration Program falls into the category of legislative or substantive rulemaking.[5] The APA defines the term "rule" broadly to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or proscribe law or policy." 5 U.S.C. § 351(4). The characterization of an action as a "rule" or "regulation" is not determinative of whether the action is subject to notice-and-comment requirements. See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 537-538 (D.C. Cir. 1986) ("While the agency's characterization of an official

---

[5]     The APA exempts from the rulemaking process agency decisions that are statements of policy, interpretive rules, procedural rules, rules the agency has "good cause" to issue without using the rulemaking process, and rules that apply to particular subject matters. 5 U.S.C. 553(b). However, for the reasons discussed below, none of those exceptions applies to this rulemaking.

14

statement as binding or nonbinding has been given some weight, of far greater importance is the language used in the statement itself."). What matters more is the agency's intention. A legislative rulemaking is one that the agency intends to be an authoritative statement of the agency's position and which the agency intends to be binding in their effect. As the First Circuit explained in La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175 (1st Cir. 1992), "If a rule creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself, then it is substantive." Id. at 1177 (citations omitted). The Supreme Court has made clear, moreover, that APA rulemaking requirements apply where, as here, an agency adopts a "new position inconsistent with any of the [agency's] existing regulations." Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 100 (1995). There can be no question that the BOP's termination decision is authoritative and binding, and is a reversal of its past practice. It is thus legislative and substantive.[6]

The cancellation of the Shock Incarceration Program is precisely the type of substantive rulemaking meant to be governed by the APA. Judges, lawyers, and probation officers were all affected by the cancellation of this program. The Director of the Administrative Office of the U.S. Courts ("AOUSC")[7] has already expressed his dismay to learn that the Shock Incarceration Program was canceled so abruptly, and has publicly lamented that "the decision was made by the BOP without advance notice and without soliciting the views of the Judicial Conference, its Criminal Law Committee, the Administrative Office's Office of Probation and Pretrial Services,

---

[6] Several courts found BOP's 2002 reversal of its CCC release practice, analogous to the termination decision for these purposes, to constitute legislative rulemaking. See, e.g., Iacaboni v. United States, 251 F. Supp. 2d 1015, 1038-39 (D. Mass. 2003) (Posner, J.) (finding that BOP's decision to alter CCC program was legislative rule); Hunt v. Federal Bureau of Prisons, 323 F. Supp. 2d 1358 (M.D. Ga. 1998) (same).

[7] In addition to supervising all administrative matters relating to the federal court system, see 28 U.S.C. § 604(a), the AOUSC serves as "the focal point for Judiciary communication, information, program leadership, and administrative reform." See AOUSC website, http://www.uscourts.gov/adminoff.html.

or chief probation and pretrial services officers." See Exh. G. In short, the entire purpose of the notice-and-comment requirement was frustrated by failing to give important BOP constituents such as the AOUSC the opportunity to address the wisdom of canceling the Shock Incarceration Program before it occurred.[8]

### C.  The BOP's Decision Violates the Ex Post Facto Clause.

Finally, Mr. Castellini is likely to succeed on his claim that the BOP's actions constituted an impermissible ex post facto law. See U.S. Const. art. I, § 9, cl. 3. As the Supreme Court recognized over two centuries ago, a law violates the ex post facto clause where it "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull, 3 U.S. 386, 390 (1798). In more contemporary parlance, the Supreme Court has held that a penal law is an unconstitutional ex post facto law if (1) it is retrospective and (2) it disadvantages the offender affected by the law. Weaver v. Graham, 450 U.S. 24, 29 (1981).

The BOP's alleged termination of the Shock Incarceration Program satisfies both these criteria. First, the action was retrospective because it applies to persons, such as Mr. Castellini, whose criminal conduct—not to mention his conviction and sentencing, with a recommendation for the Shock Incarceration Program—occurred prior to the program's elimination. Thus, the BOP's action "changes the legal consequences of acts completed before its effective date." Weaver, 450 U.S. at 31. Second, the BOP's action disadvantages Mr. Castellini. If the BOP's unlawful action stands, Mr. Castellini will not able to serve his prison term in an ICC. Had Mr.

---

[8]  It is worth noting that the BOP is normally more solicitous of its various constituencies, and has traditionally adhered to notice and comment rulemaking in administering the ICC Program. On at least 40 prior occasions when the BOP has made changes to the ICC program, it has submitted those changes to the provisions of § 553. See, e.g., 68 Fed. Reg. 73157 (2003) (amending regulations as to its drug abuse treatment program); 64 Fed. Reg. 9428 (1999) (amending regulations relating to inmates' participation in program reviews); 61 Fed. Reg. 18658 (1996) (final rule adopting regulations relating to the operation of the ICC program).

Castellini successfully completed the ICC program and the subsequent CCC term, his sentence would have been reduced by five months. See P.S. 5390.08, § 16(a). See Lynce v. Mathis, 519 U.S. 433, 445-446 (1997) (retroactively canceling prisoner's release credits was prohibited ex post facto law); See also Iacaboni v. U.S., 251 F. Supp. 2d 1015, 1041 (D. Mass. 2003) (Ponsor, J.) (BOP's action withdrawing prisoners' eligibility for community confinement violated ex post facto principles).

The BOP's decision to eliminate the Shock Incarceration Program is analogous to its 2002 decision (ordered by the Department of Justice) to stop placing inmates in community corrections centers for the last six months of their sentences regardless of the length of their sentences. The recent case law that invalidates the BOP's 2002 decision on ex post facto grounds is applicable here as well, as the BOP's termination of the Shock Incarceration Program is similarly infirm. See, e.g., Panchervikov v. Federal Bureau of Prisons, 2004 WL 875633, *3 (S.D.N.Y. Apr. 23, 2004); Crapanzano v. Menifee, 2004 WL 736860 (S.D.N.Y. Apr. 5, 2004); Monahan v. Winn, 276 F. Supp. 2d 196, 216 (D. Mass. Aug. 12, 2003) (Gertner, J.); Iacaboni, 251 F. Supp. 2d at 1041-1042; United States v. Serpa, 251 F. Supp. 2d 988, 990 (D. Mass. Mar. 12, 2003) (Young, C.J.); Ashkenazi v. Attorney General, 246 F. Supp. 2d 1, 3-7 (D.D.C. 2003), vacated as moot, 346 F.3d 191 (D.C. Cir. 2003).

## II. ALL OF THE EQUITABLE FACTORS FAVOR A PRELIMINARY INJUNCTION.

There can be little dispute that the remaining, "equitable" factors regarding preliminary injunctive relief are satisfied here. First, the harm to Mr. Castellini if he is not able to be considered for and participate in the Shock Incarceration Program, and have the opportunity for both early placement in a CCC and a reduced sentence, are clearly irreparable: the loss of time spent with his wife and children, as well as a further interruption in his business. Courts

considering analogous hardships inflicted on federal prisoners as a result of the BOP's 2002 reversal of its CCC placement policy had little trouble finding them irreparable. See Monahan v. Winn, 276 F. Supp. 2d 196, 222 (D. Mass. 2003) ("Improperly subjecting offenders to prison rather than community confinement inflicts irreparable harm on them, their families, and their communities."); Ashkenazi, 246 F. Supp. 2d at 10 ("Plaintiff would certainly suffer irreparable harm as a result of confinement in a prison, rather than in a CCC."); Hurt, 323 F. Supp. 2d at 1362 ("Plaintiff will suffer irreparable injury if the injunction is denied and his incarceration . . . continues, as his return to his business and his family obligations will be further delayed.")

Second, Mr. Castellini's harm outweighs any harm to the BOP if the injunction is granted. Any harm to the BOP is purely speculative, as the injunction simply requires the BOP to preserve the status quo pending a final decision on the merits. See Matus, 367 F.3d at 72 ("The aim of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, to move effectively to remedy discerned wrongs.")

Third, a preliminary injunction is most assuredly in the public interest. As one district court has observed, an unlawful decision by an administrative agency "invokes a public interest of the highest order: the interest in having government officials act in accordance with law." Seattle Audubon Society v. Evans, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (citing Olmstead v. United States, 277 U.S. 438, 485 (Brandeis, J., dissenting)). The public also has a strong interest in "maintaining a full menu of appropriate punishment options," Monahan, 276 F. Supp. 2d at 222, and in ensuring that laws do not violate the ex post facto clause, Ashkenazi, 246 F. Supp. 2d at 9.

In sum, all of the equitable factors counsel in favor of a preliminary injunction.

## **CONCLUSION**

For the foregoing reasons, Mr. Castellini requests that this Court issue a temporary restraining order and preliminary and permanent injunctions:

   a. enjoining the BOP from effectuating its decision to terminate the Shock Incarceration Program;

   b. ordering the BOP to continue operation of its ICC Program consistent with its operation of the program before any decision was made to terminate the program; and,

   c. ordering the BOP to in good faith consider Mr. Castellini for placement in an ICC program pursuant to criteria that existed prior to the BOP's decision to terminate the program; or, as an alternative to the above,

   d. ordering the BOP to administer Mr. Castellini's sentence in a manner that affords him the advantages of the ICC program, including his being eligible for designation to a Community Confinement Center after six months and for a reduction in his sentence.

A proposed form of order is attached as Exhibit I.

Respectfully submitted,

RICHARD MR. CASTELLINI

By his attorneys,

_____
James C. Rehnquist (BBO # 552602)
David S. Schumacher (BBO # 647917)
Sheryl A. Koval (BBO # 657735)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000