UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
RICHARD CASTELLINI,               )
                                  )
        Plaintiff,                )
                                  )
        v.                        )    Civil Action No.
                                  )    05-10220-PBS
HARLEY G. LAPPIN (in his official )
capacity as Director of the       )
Bureau of Prisons),               )
                                  )
        Defendant.                )
_____)
```

## OPPOSITION OF THE DEFENDANT TO THE PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

The defendant, Harley G. Lappin, in his official capacity as Director of the Bureau of Prisons (the "BOP"), submits his Opposition to Richard Castellini's ("Castellini") Motion and Memorandum of Law for Temporary Restraining Order and/or Preliminary Injunction. For the reasons set forth below, the plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction should be denied.

### INTRODUCTION

The Bureau of Prisons operates three specialized programs, commonly referred to as Intensive Confinement Centers ("ICC")[1], that integrated military boot camp philosophy with the Bureau's

---

[1]  The Intensive Confinement Center, commonly known as boot camp, is referred to as the Shock Incarceration Program in the statute. 18 U.S.C. § 4046. These terms will be used interchangeably throughout this Opposition.

1

traditional correctional values.  The purpose of an ICC is to place inmates in a highly structured environment as a means of promoting personal development, self-control and discipline, thereby reducing the potential for recidivism.  These programs involve a very intensive, highly structured environment and are exceedingly costly to maintain.  As explained fully in the attached memorandums and letters (see: Exhibits 1-3)[2], the Director of the Bureau of Prisons has decided to no longer offer the ICC programs.  The costs associated with maintaining the ICCs (as a result of, among other things, the staff resources necessary to provide core programming), combined with research (that found no significant difference in recidivism rates between boot camp inmates and similar offenders in traditional institutions), led to the exercise of his discretion in phasing out these programs.

In this case Castellini claims a legal right to placement in the BOP's ICC.  But, the BOP has the exclusive authority to designate the place of incarceration for Castellini.  Even if a designation of confinement is a part of a judicial sentence,

_____

[2]      (i)Exhibit No. 1 - Message to All Staff from Director Harley G. Lappin, dated January 5, 2005;

(ii) Exhibit No. 2 - Memorandum from Director Harley G. Lappin dated January 14, 2005; and

(iii) Exhibit No. 3 - Letter from Director Harley G. Lappin to the Honorable Sim Lake, Chair, Judicial Conference of the United States dated February 22, 2005.

Castellini does not have a right to be housed in the ICC and only the BOP has the authority to designate a place of confinement.

The statute upon which the plaintiff relies, 18 U.S.C. § 4046, is an enabling statute that provides that the BOP "may" place inmates in the ICC program.  The statute does not make it mandatory for the BOP to place inmates into the ICC program.  The BOP did not violate the notice and comment section of the Administrative Procedure Act, 5 U.S.C. § 553, ("APA") as the BOP was exercising its rule making power to change the implementation of a program within the statutory delegation of its authority. Lastly, the BOP's decision to terminate the ICC program does not violate the Ex Post Facto Clause of the Constitution as the cancellation of the program has not, and will not impose a greater punishment, nor does it increase the term of imprisonment for Castellini.

**ARGUMENT**

1.  **THE EXECUTIVE BRANCH OF GOVERNMENT HAS EXCLUSIVE DISCRETION TO DESIGNATE THE PLACE OF CONFINEMENT FOR INMATES SENTENCED TO TERMS OF IMPRISONMENT**

On January 28, 2005, the United States District Court for the District of Massachusetts issued an amended Judgment and Commitment order sentencing Castellini to a term of twenty one months followed by a term of supervised release of two years. The court issued the following recommendation to the Bureau of Prisons: "[t]hat the defendant participate in the Intensive

3

Confinement Center Program."

The Executive Branch of Government has been given the authority to administer the federal prison system. 18 U.S.C. § 4001 and 18 U.S.C. § 3621. The Attorney General has delegated this authority to the BOP. 28 C.F.R. § 0.96. Moreover, Congress specifically committed inmates sentenced to a term of imprisonment to the custody of the BOP. 18 U.S.C. § 3621(a) and (b). Judicial review of the BOP's designation decisions, under 5 U.S.C. § 701(a)(1), including those related to the ICC, is precluded by title 18 U.S.C. § 3625.

Prison officials have broad administrative and discretionary authority over the institutions they manage. Hewitt v. Helms, 459 U.S. 460, 467 (1983). As a result, courts should hesitate to exercise oversight and second-guess the judgment of prison administrators. Wolff v. McDonnell, 418 U.S. 539, 566 (1974). Thus, designation of a facility of confinement is a function wholly within the discretion of the BOP. See, Olim v. Wakinekona, 461 U.S. 238, 246 (1983); Meachum v. Fano, 427 U.S. 215, 228 (1976).

Inmates have no right to be housed in a particular institution or a particular part of an institution; Powell v. Department of Corrections, 647 F. Supp. 968, 971 (N.D. Okla. 1986); nor in a specific institution. Meachum, supra at 224; Montanye v. Haymes, 427 U.S. 236, 242-43 (1976); Grayson v.

4

Rison, 945 F.2d 1064, 1067 (9th Cir. 1991); Beard v. Livesay, 798
F.2d 874, 876 (6th Cir. 1986); Leibowitz v. U.S., 729 F. Supp.
556 (E.D. Mich. 1989), aff'd without opinion, 914 F.2d 256 (6th
Cir. 1990); U.S. v. Rocha-Leon, 187 F.3d 1157, 1159 (9th Cir.,
1999). See also U.S. v. Voda, 994 F.2d 149, 151-52 (5th Cir.
1993)(explaining that ". . . only the Bureau of Prisons has the
actual authority to designate the place of incarceration . . . .
The Bureau of Prisons is given this responsibility because the
executive branch and not the judicial branch is responsible for
administering sentences").

        Thus, Castellini does not have a right to be housed in an
institution of his choice, namely, one that offers the boot camp
program.  The Court clearly has no authority to determine or
designate a sentenced inmate's place of confinement, which is
evident as the Court just issued a recommendation for placement
in ICC.  See Montos v. United States, 261 F.2d 39, 40 (7th Cir.
1958) (designation of place of confinement is no part of a
judicial sentence and is nothing more than surplusage); Bateman
v. United States, 277 F.2d 65, 69-70 (8th Cir. 1960) (inclusion
of provision designating place of confinement is treated as
surplusage and disregarded).  The court's recommendation for
placement in an ICC has absolutely no binding effect on the BOP.
See U.S. v. Pineyro, 112 F.3d 43 (2nd Cir. 1997)("The district
court's recommendation was not binding on BOP . . .  Accordingly,

it is not an order . . ."). It is within the exclusive
discretion of the BOP to determine when and how Castellini will
serve his sentence.

**2.  18 U.S.C. § 4046 DOES NOT IMPOSE ON THE BOP
A DUTY TO MAINTAIN INTENSIVE CONFINEMENT CENTERS**

Castellini contends that the termination of the ICC Program
violates 18 U.S.C. § 4046. It is well established that prisoners
do not have constitutional rights to particular classifications
or to eligibility for particular rehabilitative programs. <u>Moody</u>
<u>v. Daggett</u>, 429 U.S. 78, 86-87, 88 n. 9 (1976). It is also clear
in this case that there is no statutory right.

18 U.S.C. § 4046 is the enabling statute that authorizes the
BOP to place inmates in Intensive Confinement Centers or boot
camps. Section 4046 states in pertinent part:

> (a) The Bureau of Prisons **may** place in a shock incarceration
> program any person who is sentenced to a term of
> imprisonment of more than 12 months, but not more than 30
> months, if such person consents to that placement.

Clearly, the language in the statute is permissive in terms of
BOP's decisionmaking regarding boot camp placement, not
mandatory, and reflects that the congressional intent was not to
impose a mandatory obligation on the BOP to provide all eligible
inmates with access to boot camp. The Code of Federal
Regulations explains that "[p]lacement in the Intensive
Confinement Center program is to be made in accordance with sound
correctional judgment <u>and the availability of Bureau resources</u>"

(emphasis added).  28 C.F.R.§ 524.31(b).  This regulation is a
reasonable interpretation of § 4046 and is entitled to
substantial deference.  Chevron U.S.A., Inc. v. Natural Resources
Defense Counsel, 467 U.S. 837, 844 (1984); see Reno v. Koray, 515
U.S. 50, 61 (1995).  Thus, the BOP has been given unfettered
discretion to make decisions regarding boot camp placement.  See
U.S. v. Middleton, 325 F.3d 386, 390 (2nd Cir. 2003)(quoting
Gissendanner v. Menifee, 975 F.Supp. 249, 250-51 (W.D.N.Y.1997)
(admission into the ICC program is "within the [Bureau of
Prisons'] sole discretion")).

Clearly, inmates are not entitled to and/or do not have a
right to be placed in boot camp.  Gissendanner, supra, at 251.
Thus, Castellini does not have a right to participate in a boot
camp program.  The BOP, exercising sound correctional judgment
and balancing the available resources in accordance with the Code
of Federal Regulations, determined that it will no longer run
boot camp types of programs in BOP institutions.  The cost of the
program exceeds benefits, if any, derived from its
implementation.  Castellini's allegation that the termination of
the ICC program is a violation of 18 U.S.C. § 4046 is without
merit.

### 3. THE ADMINISTRATIVE PROCEDURES ACT DOES NOT APPLY TO A CHANGE OF POLICY

Castellini contends that the elimination of the ICC program
is a violation of the Administrative Procedures Act ("APA") as

7

there was no notice and comment to the public before its
elimination.  The announced change in application of § 4046 is
interpretative and not subject to the APA Requirements. The APA
expressly provides that the notice and comment requirement "does
not apply – (A) to interpretive rules, general statements of
policy, or rules of agency organization, procedure, or practice."
5 U.S.C. § 553(b)(3).  Accordingly, the APA does not require
notice and comment for interpretive rules and policy statements,
such as a change in programming. Id.  See Lincoln v. Virgil, 508
U.S. 182, 196 (1993) (explaining that "[t]he notice-and-comment
requirements [of the APA] apply . . . only to so-called
'legislative' or 'substantive' rules," not interpretive rules or
policy statements).

A rule is interpretive if "an agency is exercising its
rule-making power to clarify an existing statute or regulation,"
and substantive if the agency is seeking to "create new law,
rights or duties in what amounts to a legislative act."  These
"legislative rules and regulations" are those rules that are
intended to "create new law, rights or duties . . . ." General
Motors Corp. v. Ruckelhaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984),
cert. denied, 471 U.S. 1074 (1985); Chrysler Corp. v. Brown, 441
U.S. 281, 302 n.31 (1979) (interpretive rules are "issued by an
agency to advise the public of the agency's construction of the
statutes and rules which it administers" (internal quotations

omitted)).  "[A]n interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule" because it changes the impact of the legislation.  <u>White v. Shalala</u>, 7 F.3d 296, 304 (2d Cir. 1993). Rather, "[i]f the rule is an interpretation of a statute rather than an extra-statutory imposition of rights, duties or obligations, it remains interpretive even if the rule embodies [an agency's] changed interpretation of the statute."  <u>Id</u>.; <u>Syncor Int'l Corp. v. Shalala</u>, 127 F.3d 90, 94 (D.C.Cir. 1997) (agency may "change[] prior statutory interpretation . . . without notice and comment" without being accused of "exercising authority to make positive law" or making "a change in the legal norm").

     The new practice constitutes an exercise of the discretion vested in the BOP and is an internal agency statement that is also consistent with the regulation.  <u>Parsons v. Pitzer</u>, 149 F.3d 734, 738 (7th Cir. 1998).  A statement of policy is not a substantive rule but rather an interpretative statement of position circulated within an agency that serves to provide administrative guidance in applying a then existing published rule.  Accordingly, it is not subject to rulemaking requirements. <u>Pelissero v. Thompson</u>, 170 F.3d 442, 447 (4th Cir. 1999).

     The termination of the ICC is based on the changed implementation of a program within the statutory delegation of

authority, that the BOP has unquestionable discretion to do.
Thus, the new procedure does not violate the APA and Castellini
is not entitled to any relief.  Clearly, the change in
programming does not create a new law nor does it change any
rights of inmates, as it is clearly established inmates do not
have a right to be incarcerated in institutions or to participate
in inmate programming of their choices.

Even if, arguendo, the new change was subject to the
requirements of the APA, the elimination of the program is
clearly within the scope of the statute and in compliance with
the Code of Federal Regulations.

### 4. BOP OFFICIALS ARE NOT ESTOPPED FROM RE-INTERPRETING THE APPLICATION OF 18 U.S.C. § 4046 TO PRISONERS

Castellini cannot argue that the BOP's change in policy
violates the principle of equitable estoppel.  In OPM v.
Richmond, 496 U.S. 414, 419-20 (1990), the Supreme Court cast
grave doubt on whether an estoppel claim can ever be maintained
against the government.  See 496 U.S. at 422-24.  Thus, estoppel
should lie against the government, if at all, "`only in rare
circumstances
. . . involv[ing] prejudice and harm beyond frustrated
expectations.'"  Davis v. Moore, et al., 772 A. 2d 204, 219 (D.C.
2001)(quoting Lerner v. Gill, 751 F.2d 450, 459 (1st Cir. 1985)).

Under the BOP's former implementation of the boot camp
program, even if Castellini may have been designated to a boot

camp (which he has not), such a past possibility does not create a future liberty interest. While the BOP's practice was to honor many judicial recommendations for boot camp placement, there is no guarantee that the BOP would have honored this Court's recommendation based on the availability of resources.

Thus, Castellini's own frustrated expectation that he would be placed in boot camp is not enough to support an actionable claim and estop the BOP from eliminating the boot camp program. 18 U.S.C. § 4046 vests in the BOP the exclusive authority to administer the boot camp program and to determine which inmates the BOP "may" place in the boot camp program.

**5. APPLICATION OF BOP'S NEW POLICY DOES NOT VIOLATE THE EX POST FACTO CLAUSE**

Castellini contends that the BOP's new policy may violate the Ex Post Facto Clause of the Constitution. "To fall within the Ex Post Facto prohibition, a law must be retrospective - that is, it must apply to events occurring before its enactment - and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." Lance v. Mathis, 519 U.S. 433, 441 (1997) (internal citations omitted). As relevant to Castellini's claim, "the focus of the Ex Post Facto inquiry is not on whether a . . . change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punished."

11

California Department of Corrections v. Morales, 514 U.S. 499,
506 n.3 (1995). See also Warren v. Baskerville, 233 F.3d 204,
208 (4th Cir. 2000) (in implementing parole and sentencing
procedures, agencies must be able "to make policy adjustments
without raising the specter of constitutional litigation"), cert.
denied, 534 U.S. 831 (2001); Cortinas v. United States Parole
Comm'n, 938 F.2d 43, 45-47 (5th Cir. 1991) (holding that revision
of federal parole regulation to provide for mandatory forfeiture
of street time following revocation of special parole does not
violate the Ex Post Facto Clause).

    The Second Circuit's decision in Caballery is instructive.
Caballery v. United States Parole Comm'n, 673 F.2d 43, 47 (2d
Cir.) cert. denied 457 U.S. 1136 (1982). There, the petitioner
alleged that his sentence had been increased in violation of the
Ex Post Facto Clause by application of a Parole Commission
regulation to toll his sentence under the Youth Corrections Act
for time during which he had absconded from parole. Id. at
43-44. He argued that at the time his sentence was imposed, the
Parole Commission's practice was not to toll a youth offender's
sentence for the time during which he failed to report to his
parole supervisor and that the new regulation therefore increased
his sentence beyond what it would have been if the prior practice
had remained in place. Id. at 43-47. While observing that the
petitioner's argument was "not without surface appeal," the

Second Circuit rejected it on the ground that the Parole Commission's prior practice was based on an incorrect interpretation of the Youth Corrections Act and that "an agency misinterpretation of a statute cannot support an Ex Post Facto claim." Id. at 47.

The BOP's decision to terminate the ICC does not increase Castellini's punishment by retroactively applying to him.  As with his other claims, this contention is also without merit and must be dismissed.  In this case, the BOP's action has neither made behavior punishable that was not punishable at the time it was committed, nor has it increased the punishment of a crime beyond the level imposed.[3]  In fact, the only effect of the BOP's change in policy is to frustrate Castellini's unilateral expectation of where and how he would be serving his term of imprisonment, matters which are well within the discretion of the

---

[3]    Any claim by Castellini that the duration of his confinement is adversely affected by the lost opportunity to successfully complete all phases of the ICC program is not grounds for relief because his sentence is not unlawfully being extended.  Castellini can only speculate that a lack of access to the ICC currently precludes the possibility of entering the ICC, and thus the possibility of completing it, and thus the possibility that he would obtain a reduction in sentence.  This is not grounds for relief.  See Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002)(a habeas challenge must rest on a favorable determination that the prisoner's challenge "would necessarily imply that he would serve a shorter sentence." Id. at 543 (emphasis in original).  "The fact that a prisoner's success in the litigation might increase the chance for early release does not, in itself, transform the action into one for habeas corpus." Id. quoting Georgevitch v. Strauss, 772 F.2d 1078, 1087 (3d Cir. 1985)).

13

BOP.

Here, as in <u>Caballery</u>, there has been no change in the underlying law.  As in <u>Caballery</u>, the agency's new policy here may have arguably caused some disadvantage to Castellini.  However, unlike in <u>Caballery</u>, Castellini will not have to serve any additional time as a result of the policy change, making his claim under the Ex Post Facto Clause weaker than the petitioner's claim in <u>Caballery</u>.

The BOP has flexibility to change programming for inmates that are not an integral part of the sentence itself, without running afoul of the Ex Post Facto Clause.  Thus, the change in the policy does not impose a greater punishment and in no way increases the term of imprisonment for Castellini or any other individual.  The policy merely changes the place and conditions of confinement, matters which fall within the discretion of the BOP.

## CONCLUSION

WHEREFORE, based on the above, it is clear that the new change in policy and decision to terminate the ICC does not violate the Ex Post Facto Clause of the Constitution, the APA or the principle of equitable estoppel.  The BOP clearly exercised its discretion and eliminated the program based on sound correctional judgment and an assessment of the available resources, which is within the scope of the statutory mandate.

For the Defendant,

By its attorney,

MICHAEL J. SULLIVAN,
United States Attorney


/s/ Rayford A. Farghuar
RAYFORD A. FARQUHAR
Assistant U.S. Attorney
1 Courthouse, Suite 9200
Boston, MA  02210
(617) 748-3284

### CERTIFICATE OF SERVICE

Suffolk,  ss.                    Boston, Massachusetts
                                 March 4, 2005

    I, Rayford A. Farquhar, Assistant United States Attorney, do hereby certify that I have served a copy of the foregoing upon plaintiff's counsel of record, James C. Rehnquist, Goodwin Procter, LLP., Exchange Place, Boston, MA 02109-2881.


/s/ Rayford A. Farquhar
Rayford A. Farquhar
Assistant U.S. Attorney

15

**U.S. Department of Justice**

**Federal Bureau of Prisons**

---

*Office of the Director*                                  *Washington, D.C. 20534*
                                                         February 22, 2005

Honorable Sim Lake, Chair
Judicial Conference of the United States
Committee on Criminal Law
9535 Bob Casey United States Courthouse
515 Rusk Avenue
Houston, Texas 77002

Re: Intensive Confinement Center Program

Dear Judge Lake:

I am writing to provide you with some additional information regarding the Bureau of Prisons' recent decision to phase out the Intensive Confinement Center (ICC) programs.  This was a difficult decision to make, but one that is absolutely necessary in light of our budgetary situation and the fact that this program does not result in a reduction in recidivism.

The phase-out of the ICC does not represent a change in the Bureau's mission.  The Bureau remains fully committed to operating safe and secure institutions and to providing opportunities for inmates to gain the skills and the training necessary for a successful, crime-free return to the community. As a result of the tight budget situation, the Bureau has renewed its emphasis on spending its limited resources to support programs that work.  The ICC program has some attractive features, but it does not reduce recidivism.[1]

The Bureau does operate several programs that have been proven to significantly reduce recidivism.  Rigorous research conducted over the past 20 years has demonstrated convincingly that inmates who participate in the Bureau's major inmate programs are substantially less likely to recidivate as compared to similar inmates who do not participate.  These programs include Residential Substance Abuse Treatment, Vocational

---

[1]     In the memorandum I previously sent to all judges, I described results of several recidivism studies, indicating that boot camps or ICC programs in general do not reduce recidivism.

Training and Apprenticeship, Education, and Federal Prison Industries (operated without appropriated funds). There are also other inmate programs, such as skills building and values development, that have been found, preliminarily, to affect inmate misconduct, which is a valid predictor of recidivism. These programs are being carefully reviewed to determine their impact on recidivism.

I understand and appreciate your concerns regarding our decision to phase out the ICC programs and replace them with ordinary minimum security operations. I assure you that this decision was made after a great deal of thought and consideration and only after the Bureau had undertaken significant other cost savings initiatives. We will certainly do everything we can to ameliorate any negative impact on offenders who might otherwise have participated in this program, including designating offenders to institutions closer to their homes than where they would have been sent for the ICC program. At these institutions, the inmates will be offered a variety of programs that we believe will help prepare them for a successful return to the community following completion of their sentence.

I hope this information is useful. Please do not hesitate to contact me if you would like to discuss this issue further.

Sincerely,

Harley G. Lappin
Director

cc:  Chief U.S. District Court Judges
     U.S. Attorneys

-2-

**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                              *Washington, DC 20534*

January 14, 2005

MEMORANDUM FOR  FEDERAL JUDGES
                CHIEF UNITED STATES PROBATION OFFICERS
                FEDERAL PUBLIC DEFENDERS
                UNITED STATES ATTORNEYS

FROM:           Harley G. Lappin
                Director

SUBJECT:        Intensive Confinement Center (ICC) Program

This memorandum is to inform you that, effective immediately, the Bureau of Prisons (Bureau) will no longer be offering the Intensive Confinement Center (ICC) program (also known as Shock Incarceration or Boot Camp) to inmates as a program option.

The ICC program, administered under 18 U.S.C. § 4046, currently operates at Bureau institutions located in Bryan, Texas; Lewisburg, Pennsylvania; and Lompoc, California.  Inmates currently enrolled in the program will be allowed to complete it, and remain eligible for extended community confinement and early release benefits as appropriate.  However, no new classes, or associated extended community confinement and early release benefits, will be offered.  Inmates will continue to be offered other pre-release programming opportunities.

Despite anecdotal successes, research has found no significant difference in recidivism rates between inmates who complete boot camp programs and similar offenders who serve their sentences in traditional institutions.  There is a national trend among correctional agencies to phase out boot camp programs, as a result of many years of experience.  (See National Institute of Justice Research for Practice Report, "Correctional Boot Camps: Lessons From a Decade of Research," June 2003, attached.)

The Bureau's unpublished research confirmed the results of those who evaluated several state programs: completion of the boot camp program did not result in lower rates of recidivism as compared to offenders with similar background characteristics who did not participate in the program.  (see National Institute of Justice Report, "Multisite Evaluation of Shock Incarceration," September 1994, attached.)

Moreover, the costs associated with maintaining the federal boot camp programs far exceed the costs of operating ordinary minimum security camps, as a result of (1) the staff resources necessary to maintain the intensive core programming that make up the "shock incarceration" or "intensive confinement" experience, and (2) the high costs of housing offenders for extended periods of time in Community Corrections Centers, where the per capita costs are significantly higher than those of housing offenders in minimum security camps.  While there are some costs saved through the early release of offenders who successfully complete the program, these savings are minimal compared to the additional costs of operating the program, which create a net increased cost to the agency of more than $1 million per year.

The lack of significant beneficial results, coupled with recent budgetary constraints, has led us to the conclusion that we can no longer justify the expenditure of public funds to operate the ICC program.

Message to All Staff
January 5, 2005

As we start the New Year, I want to provide you with an update regarding plans that the Executive Staff and I have developed to allow us to continue to successfully perform our mission and further reduce our costs, as necessary to live within the very constrained budget we are facing this fiscal year. In my Message to Staff dated October 4, 2004, I indicated that the Executive Staff and I had discussed several cost savings initiatives that could comprise Phase III of the Bureau's ongoing cost reduction activities, depending on the appropriations we received from Congress.  The Fiscal Year 2005 budget enacted by the Congress leaves the Bureau of Prisons with a deficit that is somewhat larger than the one we faced in 2004.  As a result, we have decided to move ahead with three major initiatives at this time, and continue work on one or two others that we will likely announce in the weeks or months ahead.  We are confident that these initiatives, detailed below, will yield substantial cost savings, while at the same time allow us to continue to operate safe and secure prisons with appropriate inmate program opportunities.  And, as with all of the cost savings initiatives undertaken to date, these initiatives were developed with regard for the three key principles identified in my earlier messages: bringing on new prison beds to reduce crowding, staffing positions that have direct contact with inmates, and minimizing the impact on staff who are being displaced and helping them find other job opportunities within the Bureau of Prisons.  As was the case with Phases I and II of the cost reduction activities, we continue to discuss the issues with the Council of Prisons Locals' Executive Board and we are committed to working with the union on these issues, as appropriate.  Finally, with the continued dedication, commitment and flexibility of our staff, to date we have achieved savings greater than $31 million as a result of all of our cost reduction initiatives.  These savings include the elimination of more than 74% of the 643 positions affected by the management reengineering initiative in Phase I.

Cost Savings Initiatives included in Phase III

- An initiative related to the ratio of inmates per case manager, counselor, and assistant case management coordinator (ACMC), to achieve greater equity in workload across institutions. Traditionally we believed that caseloads of 150-200 inmates per case manager or counselor were reasonable, and programs operated with these staffing levels were successful.  But, at some locations case managers and counselors are managing fewer inmates.  Accordingly, we want to realign staffing to bring all institutions into the range of 150-200 inmates per case manager or counselor.  For assistant case management coordinators the ratio will be at least 1,500 inmates per staff member, although many of our larger facilities currently operate successfully without an ACMC.  This initiative should save approximately 250 positions across the Bureau, 110 of which are currently vacant.  Our target completion date for this initiative is October 28,  2005; our goal is that affected staff will transition to new assignments by October 28, 2005, by using the displaced employees process on Sallyport.

- The identification of "mission critical posts" on the custodial roster, thereby allowing us to meet three key objectives: first, establish posts that would be vacated only under rare circumstances; second, reduce the reliance by correctional services on other departments to cover custody posts; and third, substantially reduce overtime costs. These objectives would be achieved by making available other correctional services posts for relief, medical escorts, and special assignments---areas that have often been covered by use of overtime or non-custody staff. Our goal is to save at least $25 million in overtime for Fiscal Year '05. We do not plan to reduce the number of correctional services positions at the present time.

- Three Intensive Confinement Center (ICC) programs, currently operated at USPs Lewisburg and Lompoc and FPC Bryan, will be phased out and replaced with ordinary minimum security programs. The ICC programs are exceedingly costly to maintain and a substantial body of research indicates that they have no impact on reducing recidivism. Our target date for closing the ICCs is July 15, 2005, with a goal of transitioning all affected staff to new job assignments by October 28, 2005. Staff will transition to new assignments using the displaced employees process on Sallyport. We anticipate this initiative will yield an annual cost savings of $1.2 million.

Over the next two weeks the Council of Prison Locals (AFGE) will be meeting with management to review and discuss implementation plans for the case manager/counselor ratio and roster initiatives.

I want to express my sincere appreciation to all of you for your efforts that have been key to the progress we have made to date, and to thank you for your patience and support. We recognize that these streamlining initiatives may generate some additional concern for staff, but strongly believe these will result in more effective and efficient operations without compromising the high standards that characterize our agency.

Harley G. Lappin