UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD CASTELLINI, <br><br> Plaintiff, <br><br> v. <br><br> HARLEY G. LAPPIN (in his official capacity as Director of the Bureau of Prisons), <br><br> Defendant. | **PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** <br><br> Case. No. 05-CV-10220 |

Defendant's Opposition ("Opp.") completely fails to address most of the arguments raised in Plaintiff's Memorandum of Law in Support of Motion for Temporary Restraining Order and/or Preliminary Injunction ("Motion"). Moreover, the arguments that Defendant does advance conflict with established law and clear Congressional intent.

**I.  Defendant Does Not Show That the BOP is Authorized to Terminate the Shock Incarceration Program.**

Defendant claims that Congress has directly spoken to the BOP's decision to terminate the Shock Incarceration Program based solely on the first line of the statute, that § 4046 "enabled" the BOP to both create the Shock Incarceration Program and operate it. As noted in Plaintiff's motion (and not refuted or even acknowledged in the defendant's opposition), the text and history of § 4046 unambiguously demonstrates that Congress *created* the Shock Incarceration Program and merely empowered the BOP to *operate* it. See Motion at 9. The legislation that generated § 4046 clearly indicates that the Congressional action "established" the Shock Incarceration Program, and the legislative history of § 4046 also clearly supports the notion that Congress merely delegated to the BOP the authority to operate it. See Motion at 10.

More than merely exceeding its delegated authority, though, the BOP's decision actually *violates* Congressional intent. The defendant argues that the BOP can terminate the Shock Incarceration Program because the "cost of the program exceeds benefits, if any, derived from its implementation" and the program has produced negligible reductions in recidivism. See Opp. at 7. Yet Congress considered *these exact arguments* during the drafting of § 4046 yet still created the program. See Sentencing Option ACT OF 1989: HEARING BEFORE THE SUBCOMM. ON CRIM. JUSTICE OF THE HOUSE COMM. ON THE JUDICIARY, 101st Cong, 1st Sess., at p. 10-12 (1989) (testimony of Michael J. Quinian, Director of Bureau of Prisons) (attached hereto as Ex. A).

Moreover, Congress specifically addressed only the BOP's objection that Shock Incarceration Program would fail because too few prisoners would be eligible, stating that "[i]f this proves to be the case, the Director can, consistent with this legislation and under authority given the Director by 18 U.S.C. 4042, contract with States that operate shock incarceration programs to place eligible Federal prisoners in State boot camp prisons." 1990 U.S.C.C.A.N. at 6621 n.6. Congress's specific delegation of this particular authority demonstrates that it did not delegate general authority over the Shock Incarceration Program. See, e.g., Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 86 (2d Cir. 2003) ("[I]t it would make no sense to presume that Congress had the general intent to delegate to an agency the power to contradict Congress's clearly expressed specific intent in some other matter.") Congress identified only, and only one, situation that constitutes program failure (i.e., the lack of sufficient qualified participants) and only one type of remedy (i.e., contracting to send eligible prisoners to state facilities). The BOP has recognized an altogether different situation as constituting program failure, for which it has fashioned an altogether different remedy. The BOP's decision to terminate the Shock

Incarceration Program thus not only exceeds its delegated authority and but also contravenes Congressional intent.[1]

In the face of these arguments, the BOP has offered no justification for its construction of § 4046. Instead, the defendant has asserted that the phrase "may assign" in § 4046 applies not only to the BOP's authority to assign inmates to a Shock Incarceration Program but also to the discretionary authority to create such a program in the first place. Such a reading is improper, as the verb "may" clearly modifies the verb "place," rather than the noun "Shock Incarceration Program." Furthermore, although the term "may" usually "implies some degree of discretion," this "common-sense principle of statutory construction is by no means invariable… and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." United States v. Rodgers, 461 U.S. 677, 706 (1983).[2]

The relevant question in this case, then, is not whether the plaintiff has a right to be housed at the "institution of his choice," see Opp. at 5, but rather whether the BOP has the authority to decide whether the Shock Incarceration Program exist at all. The answer, based on conclusive legislative history and First Circuit and Supreme Court case law, is no.

---

[1] The defendant does not (and cannot) refute the plaintiff's argument that an agency's power to administer a program does not convey the power to make "fundamental changes" to the program. See Motion at 11-13.

[2] The BOP's reading of § 4046 is also logically incoherent. To say that the BOP "may assign" the plaintiff to a Shock Incarceration Program is to say that the BOP has discretion to do so. See, e.g., DirecTV, Inc. v. Brown, 371 F.3d 814, 817 (11th Cir. 2004). Yet to say that a choice is "discretionary" is to presuppose that there is more than one viable alternative for the decisionmaker to choose. Berkovitz v. United States, 486 U.S. 531, 536 (1988) ("Conduct cannot be discretionary unless it involves an element of judgment or choice.") (citations omitted). The BOP's claim to have "discretion" over assignment to the Shock Incarceration Program, then, requires that BOP be able to choose between placement and non-placement. Otherwise, the BOP would *lack* the requisite permission or discretion or authority to assign the plaintiff to a Shock Incarceration Program (since the BOP have "discretion" to make a decision for which there is only one choice). However, under the defendant's reading of the statute, it is impossible for the BOP to assign plaintiff or any other federal inmate to Shock Incarceration. The BOP cannot use its "discretion" to preclude itself from ever again using its discretion. See, e.g., Succar v. Ashcroft, 394 F.3d 8, 26 n.23 (1st Cir. 2005) ("[A]n agency's failure to . . . exercise its discretion, when properly called upon to do so, is subject to judicial review for arbitrariness and capriciousness. [T]he Attorney General must actually exercise his discretion to determine whether the paroled individuals that Congress has deemed eligible for adjustment of status should be granted this relief.").

## II.    The Proper Remedy for the BOP Failure to Follow the APA's Notice-and-Comment Procedures is to Enjoin the Unlawful Termination and to Require the BOP Should Continue to Designate Prisoners to ICCs.

The Defendant claims that the BOP's action is exempt from the APA's notice-and-comment provisions because the decision to terminate the Shock Incarceration Program was either an interpretive rule or policy statement, rather than "legislative rule." See Opp. at 8.  The Defendant's arguments, however, are wholly dependent upon the conclusion that the BOP has general authority over the Shock Incarceration Program.  See Opp. at 9-10.  For the reasons mentioned above and not refuted by the Defendant, the BOP lacks such general authority.  Moreover, regardless of whether it has such general authority, the BOP's decision to terminate the Shock Incarceration Program is clearly a legislative rule, rather than an interpretive rule or policy statement.  As discussed in the Motion, the BOP's decision has all the hallmarks of a legislative rule: it is binding, imposes obligations that are not outlined in the statute itself, and it has the force or effect of law.  See Motion at 15.

Nor is the BOP's decision to eliminate the Shock Incarceration Program a mere "chang[ed] interpretation of a statute," rather than a "change in the legal norm."  Opp. at 9.  An interpretive rule is one that "does not effect a substantive change in the regulations."  Warder v. Shalala, 149 F.3d 73, 80 (1st Cir. 1998).  The BOP's actions would have the exact opposite effect, eviscerating all of the BOP's current regulations governing the Shock Incarceration Program.  See 28 C.F.R. 254.30-254.33.  Even if the BOP's decision to terminate the Shock Incarceration Program was merely a "change[d] implementation of a program within the [BOP's] statutory delegation of authority," it would nevertheless require notice and comment rulemaking as a "new position inconsistent with any of the [agency's] existing regulations."  Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 100 (1995).

Because the BOP violated the APA's notice-and-comment requirements, it should be enjoined from closing the ICCs and should be ordered to continue designating prisoners to these facilities. In other words, the Court should require the BOP to maintain the status quo that was in place before the unlawful termination was announced. A similar issue arose in Iacaboni v. United States, 251 F. Supp. 2d 1015 (D. Mass. 2003) (Ponsor, J.), which addressed the BOP's decision to stop allowing inmates to serve a portion of their sentences in community confinement centers. The court invalidated the BOP's decision because it BOP failed to follow the APA's notice-and-comment requirements. The Court held that it would continue to designate prisoners to CCCs as if the unlawful decision had never been made, and it enjoined the BOP from transferring prisoners from the CCCs. Id. at 1045.

Judge Ponsor's decision finds support in Alaniz v. Office of Personnel Management, 728 F. 2d 1460 (Fed. Cir. 1984). In Alaniz, the Federal Circuit invalidated an OPM rule changing the methodology of determining COLAs because the agency failed to submit the rule to notice and comment. The court noted that it is a "well-established rule that administrative rules found to be in violation of the notice and comment requirements of the APA are void and ineffective," and, therefore, entitled to no judicial recognition. Id. at 1470. Distinguishing the cases relied on by the OPM, the court noted that "in none of these cases did the court decide to keep the invalid agency action in effect pending retroactive validation through compliance with APA procedures." Id.

Therefore, because the BOP has attempted to terminate the Shock Incarceration Program without following the APA's notice-and-comment requirements, the Court should invalidate the BOP's decision. Consistent with the status quo prior to the unlawful termination decision, the BOP should be ordered to continue to administer the Shock Incarceration Program and continue

to consider the eligibility of prisoners, such as Mr. Castellini, whose sentence includes a recommendation to participate in the program.

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in Mr. Castellini's Motion, the Court should invalidate the BOP's decision to terminate the Shock Incarceration Program.

    Respectfully submitted,

    RICHARD CASTELLINI

    By his attorneys,

    /s/ David S. Schumacher_____
    James C. Rehnquist (BBO # 552602)
    David S. Schumacher (BBO # 647917)
    Sheryl A. Koval (BBO # 657735)
    GOODWIN PROCTER LLP
    Exchange Place
    Boston, Massachusetts 02109-2881
    (617) 570-1000

OF COUNSEL:
Stephen Galoob
GOODWIN PROCTER LLP
901 New York Avenue N.W.
Washington, D.C. 20001
(202) 346-4000

Dated: March 18, 2005

LIBA/1515528.2

# EXHIBIT A

# SENTENCING OPTION ACT OF 1989

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CRIMINAL JUSTICE

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIRST CONGRESS

FIRST SESSION

ON

## H.R. 2985

SENTENCING OPTION ACT OF 1989

SEPTEMBER 14, 1989

## Serial No. 27



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

23-502    WASHINGTON : 1989

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

10

### Testimony of J. Michael Quinlan
### Director, Federal Bureau of Prisons

Mr. Chairman and members of the Subcommittee, I appreciate the opportunity to appear before you and to provide Bureau of Prisons' input regarding H.R. 2985, "Sentencing option Act of 1989."

This bill would allow the Court, in imposing a term of imprisonment of not less than 12 months and not more than 16 months, to find an able-bodied defendant eligible for placement in a disciplinary prison. An eligible defendant who consents to placement in a disciplinary prison would adhere to a strict regimen, which emphasizes discipline, physical training, hard labor, drill and ceremonies-all characteristics of military basic training.

As we interpret the term, "disciplinary prisons" are correctional "boot camps." This concept is nearly five years old. Currently, nine states operate boot camp programs, or pilot programs, and ten additional state correctional agencies are reportedly planning to implement boot camp programs. These programs are typically designed for young felons in good physical health who are facing their first period of incarceration. The underlying philosophy in their operation is that exposure to this program will either directly deter further criminal conduct, or enable the participants to develop internal strengths that will make them more resistant to future illegal activity.

The success of these programs is yet undetermined. As noted in a September 1988 GAO report, it is too early to tell whether these programs offset prison overcrowding, reduce costs of incarceration, or reduce recidivism. Under some conditions, boot camp programs may actually increase the population of incarcerated offenders by resulting in confinement of offenders who would otherwise have been placed on probation. The premise that offenders who would otherwise be placed in traditional correctional settings are diverted to boot camp programs and then recidivate at a lower rate, thereby reducing traditional institution populations has not been clearly demonstrated. Additionally, the selection criteria for placement in a boot camp program may substantially affect the impact that such programs have on prison populations and overcrowding.

Dr. John DiIulio, Professor of Political Science at Princeton and a recognized expert on correctional programs, recently noted that "Boot camps may have no more or less of an impact than traditional incarceration or community programs. Definitive studies do not exist." I might add that the National Institute of Justice has commissioned a major study and pilot of the boot camp concept, in which military resources will be employed. This kind of research should help clarify the effectiveness and practicality of boot camp-type programs in a correctional setting.

11

2

I would like to emphasize that our current approach to handling minimum security offenders involves use of camp facilities with a heavy emphasis on mandatory work programs and opportunities for physical fitness activities during off-duty hours. These concepts have proven over the years to be cost effective and successful tools in managing the approximately 38 percent of our population that is properly classified for minimum security settings. However, work requirements and fitness opportunities are included in the regimen of all 58 Bureau institutions.

The Bureau of Prisons recently reviewed the boot camp concept for implementation. The profile of a typical Federal offender reflects an inmate 37 years old, with a first arrest at age 24, first commitment at age 28, and an average of 6 prior arrests, 4 prior convictions and 2 prior commitments. Using the criteria most frequently used for placement in boot camp programs, we found that we currently have approximately 60 young, nonviolent offenders out of the 50,493 inmates in Bureau custody who are serving their first commitments. Screening this population further for medical fitness and other necessary criteria would no doubt reduce this number even further.

The Bureau of Prisons is approaching this subject cautiously because there are to few inmates in the Bureau who would qualify, but also because a number of correctional administrators managing such programs have expressed concern regarding difficulty in ensuring that abuses do not occur. Most prominent among these concerns is the use of summary punishment in the typical boot camp environment, an approach that is completely different from that of the Bureau of Prisons on inmate discipline. Through the years, the Bureau has operated a very successful program of inmate discipline based on removal of privileges, separation from the general population, and increased levels of supervision as the primary sanctions. This imposition of disciplinary sanctions is effected only after a full investigation of the charges and one or more hearings before a disciplinary authority, to ensure that due process safeguards are followed. Those important safeguards do not exist in most boot camp operations utilizing summary punishment, and programs that operate in this manner may create significant concerns in the area of Eight Amendment protections. Should the Bureau undertake such a program, the regulations for its operation would be carefully crafted to avoid any potential constitutional concerns, but I should note that this may create the possibility that some observers might feel such an institution was not really a boot camp.

I have another underlying concern. Many who advocate these programs do so from a very real persuasion that they can be effective in changing human attitudes and behavior, a belief that often is reinforced through personal experience in the military. However, it is important to bear in mind that the military induction

3

experience that many of us had was followed by several years in a structured, healthy, and supportive environment -- one that helped solidify the new traits that boot camp had instilled. Offenders "graduating" from correctional boot camps will have no such support network, and most will return to the ghetto, where a crime-ridden subculture will not reinforce any gains they may have made in the camp setting.

We certainly view the boot camp concept as a viable alternative to traditional incarceration for youthful offenders with minimal criminal histories, and would support legislation that facilitates their use for appropriately classified offenders who do not present a risk to the public. However, rather than developing a boot camp program for the Bureau of Prisons, given the small population eligible, we believe a more prudent use of resources would be to develop contracts with those correctional agencies that have well-developed programs in place. We currently contract with state agencies for placement of juvenile offenders. The same approach could be adopted for placement, in boot camps, of offenders determined by the courts to be appropriate. These quality boot camp operations emphasize both physical fitness and substance abuse training and are highly program intensive. Such a procedure would provide for placement of selected, qualified offenders without the investment required to develop and implement a major program on the Federal level. Then, should the population of qualified inmates in the Federal system increase, and the impact of such programs be demonstrated empirically, an independent program could be developed by the Bureau of Prisons.

This concludes my formal statement, Mr. Chairman. I would be pleased to answer any questions you or your colleagues may have.