UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RICHARD CASTELLINI,<br>    Plaintiff,<br><br>          v.<br><br>HARLEY G. LAPPIN (in his<br>official capacity as Director<br>of the Bureau of Prisons),<br>    Defendant, | CIVIL ACTION NO. 05-10220-PBS |

**MEMORANDUM AND ORDER**

April 12, 2005

Saris, U.S.D.J.

## I. INTRODUCTION

Plaintiff Richard Castellini,[1] who was sentenced to twenty-one months of incarceration with a recommendation that his sentence be served in the federal boot camp program, moves for a temporary restraining order and/or preliminary injunction to prevent defendant Harley Lappin, Director of the federal Bureau of Prisons ("BOP"), from terminating the boot camp program. Plaintiff argues that he is likely to succeed on the merits because the BOP's termination of the program exceeded the BOP's authority, violated the notice-and-comment requirements for agency rulemaking under the Administrative Procedure Act ("APA"),

---

[1] Plaintiff has not sought to certify a class.

5 U.S.C. § 553, and violated the *Ex Post Facto* Clause, U.S. Const. art. I, § 9, cl. 3.  After hearing, plaintiff's motion is **ALLOWED** on the ground that plaintiff is likely to succeed on his claim that the BOP failed to comply with the APA and violated the *Ex Post Facto* Clause.

## II. BACKGROUND

Congress enabled the creation of the federal boot camp program, also known as the Shock Incarceration Program ("SIP") or Intensive Confinement Center ("ICC") program, in the Crime Control Act of 1990. Pub. L. No. 101-647, § 3001, 104 Stat. 4789 (codified at 18 U.S.C. § 4046).  The statute provides:

> (a) The Bureau of Prisons may place in a shock incarceration program any person who is sentenced to a term of imprisonment of more than 12, but not more than 30, months, if such person consents to that placement.
>
> (b) For such initial portion of the term of imprisonment as the Bureau of Prisons may determine, not to exceed 6 months, an inmate in the shock incarceration program shall be required to--
>     (1) adhere to a highly regimented schedule that provides the strict discipline, physical training, hard labor, drill, and ceremony characteristic of military basic training; and
>     (2) participate in appropriate job training and educational programs (including literacy programs) and drug, alcohol, and other counseling programs.
>
> (c) An inmate who in the judgment of the Director of the Bureau of Prisons has successfully completed the required period of shock incarceration shall remain in the custody of the Bureau for such period (not to exceed the remainder of the prison term otherwise required by law to be served by that inmate), and under such conditions, as the Bureau deems appropriate.

18 U.S.C. § 4046.  At the time of the statute's enactment, "the

Bureau of Prisons [did] not have the legal authority necessary to operate a shock incarceration program." H.R. Rep. No. 101-681(I) (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6557, 6558.

> While the BOP could set up a boot camp prison, it has no authority to release an inmate before that inmate's term would otherwise expire. A shock incarceration program is based upon an inmate serving a shorter, but more arduous, term. Legislation is necessary, therefore, if there is to be a Federal shock incarceration program.

Id. The purpose of the legislation was "to enable the Federal Government" and, more specifically, to "authorize[] the Bureau of Prisons to operate a shock incarceration program." Id.; see United States v. Padilla-Galarza, 351 F.3d 594, 599 (1st Cir. 2003) ("The boot camp program ... is authorized by statute, 18 U.S.C. § 4046 ...."). Congress also authorized funding for the program "for fiscal year 1990 and each fiscal year thereafter," § 3002, 104 Stat. 4789, although Congress has not appropriated funds specifically for the boot camp program, see, e.g., Consolidated Appropriations Act, 2004, Pub. L. 108-199, 118 Stat. 3, 53-55 (appropriations for the Federal Prison System).[2]

The BOP enacted regulations to establish the boot camp program. See Intensive Confinement Center Program, 61 Fed. Reg. 18,658 (Apr. 26, 1996); Drug Abuse Treatment and Intensive Confinement Center Programs: Early Release Consideration, 62 Fed.

---

[2] A search of congressional appropriation acts since 1990 yields no reference to the SIP, ICC, or federal boot camp program.

Reg. 53,690 (Oct. 15, 1997) (both codified at 28 C.F.R. §§ 524.30-.33 (2004)). These regulations include "eligibility for consideration" requirements, 28 C.F.R. § 524.31(a), and state that placement in the program "is to be made by Bureau staff in accordance with sound correctional judgment and the availability of Bureau resources," 28 C.F.R. § 524.31(b).

After a two-week trial in this Court (Tauro, J.) in July 2002, plaintiff was convicted of money laundering and conspiracy to launder money. (Pl.'s V. Compl. ¶ 16.) At a sentencing hearing on August 12, 2003, the Court sentenced plaintiff to twenty-one months of imprisonment. (Id. ¶¶ 17, 18.) The Court stayed the sentence pending appeal to the First Circuit, which affirmed plaintiff's conviction and sentence on December 15, 2004. (Id. ¶ 19.) On January 6, 2005, this Court recommended that plaintiff, who met the eligibility qualifications, be allowed to self-report to the ICC at USP-Lewisburg on February 14, 2005. (Id. ¶¶ 18-21.) According to plaintiff, if he successfully completed the boot camp program and subsequent community confinement term, his sentence would be reduced by five months based on the program's provision for sentence reduction. See 28 C.F.R. § 524.32(d). (Pl.'s V. Compl. ¶ 18.)

On January 5, 2005, however, defendant had announced to BOP staff that the BOP was terminating the boot camp program due to budgetary pressures. Defendant stated that "ICC programs are

exceedingly costly to maintain" and that eliminating the program would save an estimated $1.2 million annually.  (Memo from Lappin to All Staff of 1/5/05 (attach. to Def.'s Opp.).)  In a memorandum to federal judges dated January 14, 2005, defendant stated that the boot camp program would be terminated "effective immediately" and that individuals enrolled in the program would be allowed to complete it but that no new inmates would be accepted into the program.  (Memo from Lappin to Fed. Judges of 1/14/05 (attach. to Def.'s Opp.).)  Plaintiff's report date has been postponed until mid-April.

### III. ANALYSIS

"[T]he test for a preliminary injunction has four factors: 1) a likelihood of success on the merits, 2) irreparable harm to the plaintiff should preliminary relief not be granted, 3) whether the harm to the defendant from granting the preliminary relief exceeds the harm to the plaintiff from denying it, and 4) the effect of the preliminary injunction on the public interest." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 75 (1st Cir. 2005).  However, "[t]he 'sine qua non' of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its claim."  SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002); see Bl(a)ck Tea Soc'y v. City Of Boston, 378 F.3d 8, 15 (1st Cir. 2004) ("[L]ikelihood of success is an essential prerequisite for the issuance of a preliminary injunction.").

A.   **Likelihood of Success**

   1.   **BOP Authority**

   Plaintiff argues that the BOP does not have the power to terminate the boot camp program and that the termination is *ultra vires*.  "An agency garners its authority to act from a congressional grant of such authority in the agency's enabling statute."  United States v. Miami Univ., 294 F.3d 797, 807 (6th Cir. 2002); see also Yeboah v. United States Dep't of Justice, 345 F.3d 216, 221 (3d Cir. 2003) ("The terms of the enabling statute establish the scope of agency authority ....").  Determining the scope of the BOP's authority over the boot camp program, therefore, begins with the interpretation of its enabling statute.  Goldings v. Winn, 383 F.3d 17, 21-22 (1st Cir. 2004) ("As in any case of statutory construction, ... analysis begins with the language of the statute.") (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)) (internal quotation omitted).

   Section 4046 gives the BOP discretion over the operation of the boot camp program.  The statute states that the BOP "may" place eligible prisoners in the program.  § 4046(a); see Jama v. Immigration & Customs Enforcement, 125 S. Ct. 694, 703 (2005) ("The word 'may' customarily connotes discretion."); see also Padilla-Galarza, 351 F.3d at 599 ("The Bureau of Prisons decides who may participate [in the program] but a recommendation by the

-6-

judge is given weight."); Gissendanner v. Menifee, 975 F. Supp. 249, 251 (W.D.N.Y. 1997) ("[C]onsideration for the 'shock incarceration boot camp' and its availability to any particular prisoner is within the BOP's sole discretion."). The statute dictates the basic participation requirements of the boot camp program, see § 4046(b) ("an inmate in the shock incarceration program shall be required to"), but otherwise contains no mandates to the BOP as to the operation of the program, its budget, or capacity. Cf. 18 U.S.C. § 3624(d)(1) ("[T]he Bureau of Prisons shall furnish [a] prisoner with ... suitable clothing" upon release.); § 4042(b) (BOP "shall" provide notice of prisoner release). This grant of discretion comports with the purpose of the legislation to enable the BOP to operate the boot camp program. H.R. Rep. No. 101-681(I), reprinted in 1990 U.S.C.C.A.N. 6472, 6558; see also Rolland v. Romney, 318 F.3d 42, 48 (1st Cir. 2003) ("[T]he plain meaning of the statutory language, as derived from the whole of the statute, including its overall policy and purpose, controls.").

   Plaintiff argues that the BOP's authority over operation of the program does not include the authority to terminate it. To say that the BOP "may assign" the plaintiff to the boot camp program means that the BOP has the discretion to assign inmates to the program, plaintiff argues, not the discretion to determine whether the program exists. In Lincoln v. Vigil, 508 U.S. 182

(1993), the Supreme Court considered the federal Indian Health Service's termination of a program for Indian children in order "to reallocate the Program's resources." Id. at 184. Justice Souter explained for a unanimous Court that

> an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, *whether the agency has enough resources*" to fund a program "at all."

Id. at 193 (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (emphasis added). Justice Souter noted that "Congress never expressly appropriated funds" for the Indian Health Service program, id. at 186, and explained,

> The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.

Id. at 192. The Court concluded that it could not intrude on the agency's budgetary discretion "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives." Id. at 193. Therefore, the Court upheld the termination of the program. Id.

Here, unlike in Lincoln, Congress enabled and authorized funding for the program at issue. See 508 U.S. at 190 ("[T]he court [of appeals] concededly could identify no statute or

regulation even mentioning the Program ...."). Section 4046 is "a general enabling statute, however, not a mandatory prescription." Town of Hallie v. City of Eau Claire, 471 U.S. 34, 42 n.5 (1985). More importantly in the Lincoln context, Congress has not specifically appropriated funds for the program. See State of New Jersey v. United States, 91 F.3d 463, 471 (3d Cir. 1996) (distinguishing authorization from appropriation in discussion of Lincoln). "Congress knows how to make an appropriation ... if it wants to," id., and "may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," Lincoln, 508 U.S. at 193. See, e.g., Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1995, Pub. L. 103-317, tit. VIII, 108 Stat. 1724 (1994) (appropriation "*to States* to develop, construct, or expand military style boot camp prison programs") (emphasis added).

   Therefore, this Court agrees with the agency's reasonable interpretation of the word "may" in § 4046, and holds that Congress intended to authorize the BOP to operate a boot camp program but did not intend to require the operation of such a program. The use of the word "shall" in relation to other BOP programs highlights the use of "may" in § 4046. See 18 U.S.C. §3621(e)(1) ("the Bureau of Prisons shall, subject to the availability of appropriations, provide residents substance abuse

treatment"); see also Lopez v. Davis, 531 U.S. 230, 241 (2001) (contrasting use of the words "may" and "shall" in same statutory section); Reno v. Koray, 515 U.S. 50, 61 (1995) (deferring to BOP's interpretation of the statute).  Thus, the BOP has the authority to reallocate boot camp resources.

> **2.    Notice and Comment**

Regardless of its authority to reallocate resources, however, the BOP's termination of the boot camp program violated the APA.  The APA "provides generally that an agency must publish notice of a proposed rulemaking in the Federal Register and afford 'interested persons an opportunity to participate ... through submission of written data, views, or arguments.'" Lincoln, 508 U.S. at 195 (quoting §§ 553(b),(c)).  "[N]umerous courts have found that the APA applies to BOP rule-making." Iacaboni v. United States, 251 F. Supp. 2d 1015, 1036 (D. Mass. 2003); see id. (listing cases).

"Determining whether an agency's statement is what the APA calls a 'rule' [for purposes of the notice-and-comment requirement] can be a difficult exercise."  Lincoln, 508 U.S. at 196-97.  "The notice-and-comment requirements apply ... only to so-called 'legislative' or 'substantive' rules; they do not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  Id. at 196 (quoting § 553(b)).  However, "the label an agency places on a

rule is not dispositive" as to whether a rule "is legislative or interpretative."  Truckers United for Safety v. Fed. Highway Admin., 139 F.3d 934, 939 (D.C. Cir. 1998).  Moreover, "[t]he line between a legislative or substantive rule and an interpretative one is, as many courts have noted, far from clear."  Warder v. Shalala, 149 F.3d 73, 79 (1st Cir. 1998).

In Lincoln, the Supreme Court held that termination of the program at issue was exempt from APA notice-and-comment requirements, potentially as a rule of agency organization and certainly as a general statement of policy.  508 U.S. at 197 (citing 5 U.S.C. § 553(b)(A)).  The Court held, "Whatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement like the one before us, that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation."  Id.  The Court added, "[D]ecisions to expend otherwise unrestricted funds are not, *without more*, subject to the notice-and-comment requirements of § 553."  Id. at 198 (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971)) (emphasis added).

However, unlike the Indian Health Service in Lincoln, the BOP established the program at issue here, which Congress enabled, through regulation subject to notice and comment.  See 61 Fed. Reg. at 18,658 ("The Bureau is publishing this regulation

as an interim rule in order to provide for public comment ...."). The APA requires notice and comment "when an agency adopts a 'new position inconsistent with any of the [agency's] existing regulations.'" Iacaboni, 251 F. Supp. 2d at 1039 (quoting Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 (1995)). Where an agency's "interpretation [of a regulation] has the practical effect of altering the regulation, a formal amendment -- almost certainly prospective and after notice and comment -- is the proper course." United States v. Hoyts Cinemas Corp., 380 F.3d 558, 569 (1st Cir. 2004); see also Warder, 149 F.3d at 80 ("[A] rule is exempt from notice and comment as an interpretative rule if it does not 'effect a substantive change in the regulations.'") (quoting Guernsey, 514 U.S. at 100).

The BOP's abrupt termination of the boot camp program is inconsistent with, and effectively repudiates, the regulations by which the BOP established the program. See Orengo Caraballo v. Reich, 11 F.3d 186, 196 (D.C. Cir. 1993) ("[W]here a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first ....") (internal quotations and brackets omitted). Plaintiff points out that on at least forty prior occasions when the BOP has made changes to the Shock Incarceration Program, it has followed the notice-and-comment provisions -- even when the changes were largely ministerial. See, e.g., Drug Abuse Treatment Program:

Subpart Revision and Clarification, 68 Fed. Reg. 73,157 (Dec. 22, 2003) (amending regulations as to its drug abuse treatment program); Classification and Program Review: Team Meetings, 64 Fed. Reg. 9,428 (Feb. 25, 1999) (amending regulations relating to inmates' participation in program reviews); Intensive Confinement Center Program, 61 Fed. Reg. 18,658 (Apr. 26, 1996) (final rule adopting regulations relating to the operation of the ICC program).

Moreover, the retroactive application of termination of the program to sentencing decisions made in reliance on the boot camp eligibility of a defendant underscores one key purpose of the notice requirement -- ensuring fairness to the affected parties. See Sprint Corp. v. FCC, 315 F.3d 369, 373 (D.C. Cir. 2003) ("the notice requirement ... ensures fairness to affected parties") (internal quotations omitted); see also Iacaboni, 251 F. Supp. 2d at 1018 ("A sentencing option of longstanding acceptance, clearly supported by statute and repeatedly reflected in the practice of hundreds of judges, was abruptly snatched away without opportunity for comment by judges ... and without even prior notice ...."). Despite the BOP's authority to reallocate boot camp resources, it cannot precipitously terminate the program without notice and comment. See Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 352 (1st Cir. 2004) ("An agency may not act precipitously or in an irrational manner in revising

its rules."). Therefore, the termination of the boot camp program violates the APA and is invalid. See <u>Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs</u>, 260 F.3d 1365, 1375 (Fed. Cir. 2001) ("Failure to allow notice and comment, where required, is grounds for invalidating the rule.") (citing <u>Auer v. Robbins</u>, 519 U.S. 452, 459 (1997)).

### 3.  *Ex Post Facto* Clause

Plaintiff also argues that termination of the boot camp program violates the *Ex Post Facto* Clause. "To fall within the *ex post facto* prohibition, a law must be retrospective -- that is, it must apply to events occurring before its enactment -- and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." <u>Lynce v. Mathis</u>, 519 U.S. 433, 441 (1997) (internal quotations and citation omitted). "[A] law need not impair a 'vested right' to violate the *ex post facto* prohibition." <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981). However,

> the ex post facto prohibition does not foreclose every change in the law that possesses some imaginable risk of adversely affecting an inmate's punishment. In the last analysis, "the question of what legislative adjustments will be held to be of sufficient moment to transgress the constitutional prohibition must be a matter of degree."

<u>Hamm v. Latessa</u>, 72 F.3d 947, 957 (1st Cir. 1995) (quoting <u>Cal. Dep't of Corrs. v. Morales</u>, 514 U.S. 499, 509 (1995)).

"[A] number of courts have held that binding administrative regulations, as opposed to those that serve merely as guidelines

-14-

for discretionary decisionmaking, are laws subject to ex post facto analysis."  Id. at 956 n.14.  Two trial courts in this district have previously held that the BOP's 2002 change in its community corrections center ("CCC") policy, which terminated the placement of inmates into halfway houses to serve short terms of imprisonment, violated the *Ex Post Facto* Clause as to defendants who had been sentenced before the policy change.  See Iacaboni, 251 F. Supp. 2d at 1018 ("The Government may not ... instruct judges, defendants and counsel that short terms of imprisonment may ... be served in community confinement, and then, *after* sentencing, change the basic rules."); see also Monahan v. Winn, 276 F. Supp. 2d 196, 219 (D. Mass. 2003) ("The Ex Post Facto Clause simply forbids retroactive application of the BOP policy change to prisoners whose offense conduct predated the change."). One court concluded, "The measure of punishment was one thing at the time of sentencing; it is substantially greater now, and with no possibility of correction."  Iacaboni, 251 F. Supp. 2d at 1042; see also Crowley v. Fed. Bureau of Prisons, 312 F. Supp. 2d 453, 462-63 (S.D.N.Y. 2004); Ashkenazi v. Attorney Gen. of the United States, 246 F. Supp. 2d 1, 4 (D.D.C. 2003) ("[T]he change in BOP policy operates retroactively.... to an offense that was committed three years and ten months before the new policy was announced, and to a guilty plea and pronouncement of sentence that occurred six and two months, respectively, before ...."),

vacated as moot, 346 F.3d 191 (D.C. Cir. 2003).

In this respect, the present case is indistinguishable from the CCC cases. Although the BOP, unlike in the CCC context, is allowing individuals currently enrolled in the boot camp program to complete it, termination of the program is still retroactive as to individuals who received a sentence with a boot camp recommendation before public notice of termination of the program on January 14, 2005. See Lynce, 519 U.S. at 441 (To be *ex post facto*, a law must "apply to events occurring before its enactment."). Plaintiff was sentenced seventeen months before (and recommended to a boot camp eight days before) defendant's memorandum to federal judges. See Crowley, 312 F. Supp. 2d at 462-63 (examining whether the sentencing judges "had relied upon BOP procedure"); Iacaboni, 251 F. Supp. 2d at 1041 (policy changed after judge sentenced petitioners "in reliance on their eligibility" for CCC program); cf. id. at 1042 (discussing invalidity of sentence "based upon an erroneous factual assumption or other error").

As in the CCC cases, therefore, the issue is whether the "practical implementation" of the "retroactive application will result in a longer period of incarceration than under the earlier rule." Garner v. Jones, 529 U.S. 244, 255 (2000); see also Johnson v. United States, 529 U.S. 694, 699 (2000) (Petitioner must show that retroactive law "raises the penalty from whatever

the law provided when he acted.").

There are a number of benefits available to an inmate who is placed in, and successfully completes, the Shock Incarceration Program. First, after serving six months in an ICC, the inmate may be transferred to community confinement, often in the inmate's home community, for a period of two-to-six months. See 28 C.F.R. § 524.32(d)(1). If the inmate successfully completes this CCC portion of the sentence, he or she may serve the remainder of the sentence in home confinement. Importantly, upon successful completion of the Shock Incarceration Program and the CCC portion of the sentence, the inmate is eligible for a reduction of up to six months in his or her sentence. § 524.32(d)(2).

Termination of the program eliminates plaintiff's potential eligibility for the program's sentence reduction, in addition to altering significantly the conditions of plaintiff's incarceration. See 28 C.F.R. § 524.32(d); see also Monahan, 276 F. Supp. 2d at 216 ("The government argues that the BOP policy change does not 'increase' an offender's punishment; it only alters its conditions. Yet the inevitable result of that alteration is to make it more punitive."). The fact that a "recommendation of [shock incarceration] does not guarantee a placement there .... does not affect the *ex post facto* analysis." Monahan, 276 F. Supp. 2d at 217; see Weaver, 450 U.S. at 29 (no

"vested right" required). Elimination of the program "can constitute an increase in punishment, because a 'prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." Lynce, 519 U.S. at 445-46 (quoting Weaver, 450 U.S. at 32); see also Monahan, 276 F. Supp. 2d at 217 ("[T]he DOJ's clampdown on BOP discretion as to place of imprisonment increases punishment for prisoners."); Iacaboni, 251 F. Supp. 2d at 1041 ("[T]he progression from a sentence *with* eligibility for possible community confinement to one *without* the remotest possibility of such eligibility constitutes a significant increase in the measure of punishment ....").

If the BOP had not terminated the boot camp program, plaintiff's designation to the program would be subject to the BOP's "sound correctional judgment and the availability of Bureau resources." 28 C.F.R. § 524.31(b). However, the BOP's discretion over allocation of resources, and over plaintiff's designation to the boot camp program, does not excuse the *ex post facto* termination of the program following plaintiff's sentencing and boot camp recommendation. See Garner, 529 U.S. at 253 ("The presence of discretion does not displace the protections of the *Ex Post Facto* Clause ...."). Therefore, based on plaintiff's *Ex Post Facto* Clause and APA claims, plaintiff is likely to succeed

on the merits in this case.  See Rullan, 397 F.3d at 75; Bl(a)ck Tea Soc'y, 378 F.3d at 15.

**B.   Other Preliminary Injunction Factors**

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy."  Rullan, 397 F.3d at 76.  Plaintiff is scheduled to begin serving his twenty-one-month sentence in a matter of days and, as such, will suffer irreparable harm if preliminary injunctive relief is not granted.  See id.; see also Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").  Moreover, the harm that plaintiff faces in serving his sentence with no chance of placement in the boot camp program outweighs the inconvenience and expense to the BOP in considering him for eligibility.  See Ashkenazi, 246 F. Supp. 2d at 10 (Given the seventeen-year history of the CCC program, "a delay pending resolution of the merits of Plaintiff's claim will not cause substantial injury to Defendants.").

Finally, maintaining plaintiff's eligibility for the boot camp program pending the BOP's compliance with the APA is in the

public interest.  See Ga. Gazette Publ'g Co. v. United States Dep't of Def., 562 F. Supp. 1004, 1011 (S.D. Ga. 1983) ("[W]here an administrative agency has exceeded its authority, or failed to follow the applicable requirements of agency regulations, and has failed to act in the public interest, court intervention is appropriate.... [T]he strong public interest in avoiding disruption of the procurement process must give way to the public interest in requiring agencies to stick to their regulations.") (internal citations omitted); see also Monahan, 276 F. Supp. 2d at 222 ("[M]aintaining a full menu of appropriate punishment options is in the public interest.").

## IV. ORDER

Plaintiff's motion for a preliminary injunction (Docket No. 2) is **ALLOWED**.  The Bureau of Prisons is enjoined from terminating the Shock Incarceration (or Intensive Confinement Center) Program until it has complied with the Administrative Procedure Act and shall in good faith consider plaintiff's eligibility for the Shock Incarceration Program.

                                           /s/ Patti B. Saris
                                          PATTI B. SARIS
                                          United States District Judge